## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT TROHA, Derivatively and on Behalf of NEW FORTRESS ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> WESLEY R. EDENS, CHRISTOPHER S. GUINTA, RANDAL A. NARDONE, DESMOND IAIN CATTERALL, DAVID J. GRAIN, C. WILLIAM GRIFFIN, TIMOTHY W. JAY, JOHN J. MACK, and KATHERINE E. WANNER, <br><br> Defendants, <br><br> and <br><br> NEW FORTRESS ENERGY, INC., <br><br> Nominal Defendant. | Case No. <br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Robert Troha ("Troha," or the "Shareholder"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant New Fortress Energy, Inc. ("New Fortress," "New Fortress Energy," or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States

Securities and Exchange Commission ("SEC"), press releases published by and regarding New Fortress, legal filings, news reports, securities analysts' reports about the Company, the securities class action *In Re New Fortress Energy Inc. Securities Litigation*, 1:24-cv-07032-JGK (S.D.NY) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of New Fortress Energy against certain of its officers and current and former members of the Company's Board of Directors for breaches of their fiduciary duties between at least September 20, 2022 and August 8, 2024, inclusive (the "Relevant Period"), and federal securities laws, as set forth below.

2.      New Fortress Energy is a company focused on worldwide energy solutions. Founded in 2014 by Defendant Wesley Edens, New Fortress' current Chief Executive Officer ("CEO") ("Edens"), the Company specializes in liquefied natural gas (LNG) infrastructure and logistics. It operates LNG terminals, power generation facilities and other infrastructure in regions including the U.S., Brazil, Jamaica, and Ireland.

3.      In July 2022, the Company publicly disclosed its plans for a floating liquefied natural gas (FLNG) facility off the coast of Altamira, Tamaulipas, Mexico (the "Altamira FLMG Project"). The project, which launched with considerable enthusiasm, involved an LNG compression unit designed to float offshore, supported by three repurposed jack-up rigs. A significant portion of the unit's construction was scheduled to take place onshore in Corpus Christi, Texas. Following the completion of construction, testing, and operational readiness, the Company intended to deploy the FLNG unit to its designated offshore location near Altamira. At that stage, the rigs were to be assembled onsite and commence production activities. In November 2022, Defendants hosted an FLNG Investor Day at the Corpus Christi construction site. Analysts

covering the event conveyed to investors that they departed "with increased confidence in [New Fortress'] ability to deploy its FLNG units on time" and noted that "much of the execution risk, for this highly ambitious gambit, has been removed."

4.      With analyst and investor interest heightened, New Fortress' stock price approached an all-time high, trading at approximately $60 per share shortly before the commencement of the Relevant Period. Capitalizing on this momentum, Defendants announced a significant corporate development in December 2022 – an "Update" to its "Dividend Policy." Under the revised policy, shareholders would receive a $3.00 per share dividend semi-annually, in addition to the Company's routine quarterly dividend of $0.10 per share. This dividend was reportedly the result of the promise of the Altamira FLGN Project and its predicted successful revenue generation. It was actually financed, however, through a $700 million draw by the Company from its credit facility.

5.      At the time, Defendant Edens exercised control over New Fortress through his ownership of more than 72.6 million shares of stock. Acting under his authority, New Fortress issued the $3.00 per share dividend, resulting in a personal cash payout to Edens of approximately $217 million. Notably, this $3.00 per share dividend was never issued again.

6.      While public investors also received dividend payments, these returns were minimal compared to the substantial losses they would later suffer as New Fortress failed to meet its FLNG-related and general earnings projections. In reality, construction at the Altamira FLNG Project did not proceed as Defendants had portrayed to investors. The project was plagued by persistent delays, which stemmed from a "chaotic" work environment, inadequate staffing, and improperly sequenced construction activities. These issues were well known to the Individual

Defendants, who closely monitored the FLNG Project and received real-time updates on its progress prior to repeatedly issuing misleading statements to investors.

7.      In an effort to obscure the full extent of project delays, Defendants made the decision to deploy the FLNG unit from the Corpus Christi construction site to its offshore location in Altamira, despite knowing that construction was still incomplete, commissioning activities had barely begun, and the workforce offshore was inadequate. As the Relevant Period advanced, however, Defendants were repeatedly compelled to acknowledge their inability to meet the previously stated project timelines and earnings guidance. By the time the Company ultimately announced, at the very end of the Relevant Period, that production had finally commenced at the Altamira FLNG Project, analysts and investors had lost confidence and trust in the Company. Due to the Defendants' misrepresentations during the Relevant Period, and the subsequent realization of the concealed risks, New Fortress' stock price fell sharply—from a high of nearly $60 per share at the beginning of the Relevant Period to below $15 per share. In a recent quarterly report, New Fortress disclosed "substantial doubt" regarding its ability to continue as a going concern absent a major asset sale or refinancing.

8.      Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) the Altamira FLNG Project was hindered by disorganized execution, inadequate planning, a failure to properly sequence construction and commission activities, and delays cause by the lack of timely procurement of essential components; (ii) that the schedule issued by the Company regarding the Altamira FLNG Project lacked any reasonable basis and was internally recognized as unrealistic; (iii) that due to these issues, the Company's financial

projections based on the success of the Altamira FLNG project were inaccurate; and (iv) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

9.      As a result of the foregoing, New Fortress, as well as its Founder, Chairman, and CEO and its Chief Financial Officer ("CFO") were named as defendants in two Securities Class Actions by investors who allege they were damaged when they purchased New Fortress shares during the Relevant Period. Those actions have since been consolidated.

10.     As set forth herein, and as alleged in the ongoing Securities Class Action, New Fortress' officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

11.     Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Class Action, a majority of New Fortress' Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Section 27 of the Securities Exchange Act (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§78n(a) and Rule 14a-9 (17 C.F.R. §240.142-9) promulgated thereunder by the SEC.

13.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

14.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

### Plaintiff

18.     Plaintiff is, and has been at all relevant times, a shareholder of New Fortress.

### Nominal Defendant

19.     Nominal Defendant New Fortress Energy Inc. is incorporated under the laws of Delaware with its principal executive offices located at 111 W. 19th Street, 8th Floor, New York, New York 10011. The Company's common stock is traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "NFE."

**Individual Defendants**

***Director Defendants***

20.     Defendant Wesley R. Edens ("Edens"), founder of New Fortress, has served as the Company's Chief Executive Officer and Chairman of the Board since August 2018. According to the 2025 Proxy the Company filed with the SEC on April 29, 2025, Defendant Edens beneficially owned 53,634,666 shares of the Company's common stock as of April 28 2025, representing approximately 19.6% of the Company's total outstanding common stock. Additionally, he is named as a defendant in the Securities Class Action.

21.     The 2025 Proxy Statement stated the following about Defendant Edens:

Wesley Edens is our founder and has been our Chief Executive Officer and the Chairman of our Board of Directors since August 2018. He has been a member of the board of directors of Fortress Investment Group LLC ("Fortress") since November 2006. Mr. Edens has been a member of the Management Committee of Fortress since co-founding Fortress in May 1998. Mr. Edens is responsible for oversight of Fortress' private equity and publicly traded alternative investment businesses. Mr. Edens previously served on the board of the following publicly traded companies and registered investment companies: Gannett Co., Inc. (formerly New Media Investment Group Inc., a publisher of print and online media) from November 2013 to May 2019; One Main Holdings, Inc. (a leading consumer finance company) from October 2013 to June 2018; FTAI Aviation Ltd. (formerly Fortress Transportation and Infrastructure Investors LLC, which owned and acquired high quality infrastructure and equipment essential for the transportation of goods and people globally) from May 2015 to May 2016; Intrawest Resorts Holdings Inc. (a resort and adventure company) from January 2014 to July 2017; Gaming and Leisure Properties, Inc. (an owner and operator in the gaming and racing industry) from December 2013 to October 2016; Nationstar Mortgage Holdings Inc. (a residential mortgage loan originator and servicer) from February 2012 to July 2016; Rithm Capital Corp. (formerly New Residential Investment Corp., a real estate investment trust primarily focused on investing in residential real estate related assets) from April 2013 to May 2016; Brookdale Senior Living Inc., from September 2005 to June 2014; GAGFAH S.A. from September 2006 to June 2014; PENN National Gaming Inc. from October 2008 to November 2013; Gate House Media Inc. from June 2005 to November 2013; Aircastle Ltd. from August 2006 to August 2012; Rail America Inc. from November 2006 to October 2012; Eurocastle Investment Ltd., from August 2003 to November 2011; Whistler Blackcomb Holdings Inc., from October 2010 to November 2012; Fortress Registered Investment Trust, from December 1999 until it deregistered with the

SEC in September 2011; FRIT PINN LLC, from November 2001 until it deregistered with the SEC in September 2011; and New Senior Investment Group Inc. from October 2014 to January 2019.

Prior to co-founding Fortress, Mr. Edens was a partner and managing director of BlackRock Financial Management, Inc. (an investment management firm), where he headed BlackRock Asset Investors, a private equity fund. In addition, Mr. Edens was formerly a partner and managing director of Lehman Brothers Holdings Inc. Mr. Edens received a Bachelor of Science in Finance from Oregon State University. Mr. Edens' extensive credit, private equity finance and management expertise, extensive experience as an officer and director of public companies and his deep familiarity with our Company as our founder led the Board to conclude that Mr. Edens should serve as a director.

22.    Defendant Desmond Iain Catterall ("Catterall") has served as a member of the Board since January 2019.

23.    The 2025 Proxy Statement stated the following about Defendant Catterall:

Iain Catterall became a member of our Board of Directors in January 2019. Mr. Catterall currently serves as a principal and Chief Executive Officer of Kirkham Capital, an investment business focused on seeding fund managers, a position he has held since founding the firm in January 2009. Prior to that, Mr. Catterall served as the head of equities at Rand Merchant Bank from January 2003 to December 2008 and was also a member of Rand Merchant Bank's management board and investment committee. He was also a founding member of Thynk Capital, a private equity company, and, prior to that, a founding director of Cadiz Holdings Limited, a Johannesburg Stock Exchange listed financial services company. Mr. Catterall holds a Bachelor of Commerce degree from the University of Natal (Durban). We believe that Mr. Catterall's extensive experience in emerging markets, capital markets and financial services brings valuable expertise to our Board of Directors.

24.    Defendant David J. Grain ("Grain") has served as a member of the board since January 2019.

25.    The 2025 Proxy Statement stated the following about Defendant Grain:

David Grain became a member of our Board of Directors in January 2019. Mr. Grain currently serves as the Chief Executive Officer of Grain Management, LLC, a private equity firm focused on investments in the media and communications sectors, which he founded in 2007. Prior to founding Grain Management, LLC, from January 2003 to December 2005, Mr. Grain served as the President of Global Signal, Inc. (formerly NYSE: GSL), the largest communication tower owner/operator at the time and an affiliate of Fortress. Prior to joining Global Signal, Inc., from 2000 to 2003, he served as Senior Vice President at AT&T Broadband

in New England, a provider of digital video, high speed Internet and digital phone services to more than two million customers in the region. Prior to leading AT&T Broadband's New England operations, Mr. Grain spent more than a decade in the financial services industry, most recently at Morgan Stanley & Co. LLC, a financial services company, in New York from 1992 to 2000 where he focused primarily on telecommunications, media and technology companies. Mr. Grain serves on the board of directors of The Southern Company (NYSE: SO), a gas and electric utility company, and of Dell Technologies (NYSE: DELL), a multinational technology company, trustee of the Brookings Institution, a member of the advisory council of the National Museum of African American History and Culture, and a member of the board of the Martha's Vineyard Museum. He is also a Lifetime Member of the Council on Foreign Relations. Mr. Grain earned a Bachelor of Arts degree in English from the College of the Holy Cross and a Master of Business Administration degree from the Amos Tuck School at Dartmouth College. We believe that Mr. Grain's experience with publicly traded companies as an executive and as a member of the board of directors brings valuable skills and leadership to our Board of Directors.

26.    Defendant C. William Griffin ("Griffin") has served as a member of the board since January 2019.

27.    The 2025 Proxy Statement stated the following about Defendant Griffin:

Bill Griffin became a member of our Board of Directors in January 2019. Mr. Griffin has more than 45 years of experience in financial services. Mr. Griffin currently serves as Executive Chairman of ServiceMac, a privately held financial services company specializing in mortgage sub-servicing. He previously served as Executive Vice President, Enterprise Strategy of ServiceLink, LLC, helping deliver end-to-end solutions to large financial institutions from January 2017 until mid-2019. Prior to that, Mr. Griffin served in various capacities within Fidelity National Financial, Inc. ("Fidelity") and its affiliates, including as Executive Vice President of Black Knight Financial Services from January 2014 to December 2016 and Executive Vice President of Sales and Marketing for Lender Processing Services from November 2011 to December 2013. He also served as President and Chief Executive Officer from 2002 to 2003 when Lender Processing Services was acquired by Fidelity. Mr. Griffin holds a Bachelor of Business Administration degree from The University of Georgia. We believe that Mr. Griffin's leadership and extensive financial experience bring significant value to our Board of Directors.

28.    Defendant Timothy W. Jay ("Jay") has served as a member of the board since March 2023.

29.    The 2025 Proxy Statement stated the following about Defendant Jay:

Timothy W. Jay became a member of our Board of Directors in March 2023. Mr. Jay has worked as Head of Government Bond Sales and Rates Trader at CRT Capital Group LLC, a financial services firm, from 2009 until his retirement in 2016. From 2005 to 2006, he served as Co-Managing Partner at Rockridge Advisors LLC, a multi-strategy hedge fund. Prior to 2005, he worked for Lehman Brothers as a Government Bond Trader, Head of Global Government Bond Business and a Liquid Markets Head Trader. During the same time, from 1996 to 2006, he served as both Chairman and Vice Chairman of the Treasury Borrowing Advisory Committee, which regularly advised the U.S. Treasury and the Federal Reserve Board on policy. He also served as a director of Intrawest Holdings from 2013 to 2017. We believe that Mr. Jay's significant knowledge of real estate and operational and financial development brings significant value to our Board of Directors.

30.      Defendant Randal A. Nardone ("Nardone") is co-founder of the Company and has served as a member of the board since August 2018, prior to which he served as the Company's CEO. According to the 2025 Proxy Statement filed by New Fortress with the SEC on April 29, 2025, Defendant Nardone beneficially owned 26,196,526 shares of the Company's common stock as of April 28, 2025, representing approximately 9.6% of the Company's total outstanding common stock.

31.      The 2025 Proxy Statement stated the following about Defendant Nardone:

Randal Nardone has been a member of our Board of Directors since August 2018. He has also been a member of the board of directors of Fortress since November 2006. Mr. Nardone served as Fortress' Chief Executive Officer from July 2013 through December 2017, after serving as its Interim Chief Executive Officer from December 2011 to July 2013. From June 2002 to September 2016, Mr. Nardone also served as Secretary for Drive Shack Inc., an owner and operator of golf-related leisure and entertainment businesses. Mr. Nardone previously served as a director of Eurocastle Investment Limited from August 2006 to August 2022. Mr. Nardone also previously served on the board of directors of Alea Group Holdings (Bermuda) Ltd. from July 2007 to September 2014; GAGFAH S.A. from September 2006 to June 2014; and Brookdale Senior Living, Inc. from January 2011 to June 2014. Mr. Nardone was previously a managing director of UBS from May 1997 to May 1998. Prior to joining UBS in 1997, Mr. Nardone was a principal of BlackRock Financial Management, Inc. Prior to joining BlackRock Financial Management, Inc., Mr. Nardone was a partner and a member of the executive committee at the law firm of Thacher Proffitt & Wood. Mr. Nardone received a Bachelor of Arts in English and Biology from the University of Connecticut and a Juris Doctor from Boston University School of Law. We believe that Mr. Nardone's leadership, management

experience and experience with corporate and securities law bring valuable experience to our Board of Directors.

32.    Defendant Katherine E. Wanner ("Wanner") has served as a member of the board

since January 2019.

33.    The 2025 Proxy Statement stated the following about Defendant Wanner:

Katherine Wanner became a member of our Board of Directors in January 2019. From 1993 to 1997, Ms. Wanner served in various roles within the finance, communications and business development groups at Brinson Partners Inc. and UBS Global Asset Management, where she was responsible for the revenue cycle, statistical analysis and market research, and later joined the private equity group in 1998. In 2001, Ms. Wanner was a founding Partner at Adams Street Partners, LLC, a global private equity firm with over $53 billion in assets under its management and offices in 12 locations around the world, and the successor firm to Brinson Partners Inc. and UBS Global Asset Management. From 2007 until her retirement in 2015, Ms. Wanner managed Adams Street Partners' US Primary investment team and served on the firm's Global Primary Investment Committee, which was responsible for sourcing, analyzing and monitoring investments in private equity partnerships, implementing strategy and approving all primary fund investments. Post Ms. Wanner's retirement from Adams Street Partners in 2015, Ms. Wanner has served as an Operating Partner at Abundant Venture Partners from 2016 to April 2018. Since April 2018 and through December 2019, Ms. Wanner served as an Advisor at Abundant Venture Partners. Ms. Wanner is currently a Senior Advisor and was a founding partner in 2020 at Fairway Capital Management, an institutional venture capital investment manager. Since 1998, Ms. Wanner has served on many private equity and venture capital advisory boards and completed many primary investments across several sectors, and was responsible for managing relationships with several of the firm's United States based venture, energy focused and special situation managers. Additionally, from 1989 to 1993, Ms. Wanner gained experience in statistical modeling, reporting, tracking and analysis as a Senior Financial Analyst at Frontier Risk Management, Range Wise, Inc. and Morgan Stanley & Co. LLC. Ms. Wanner received a Bachelor of Science in Finance from Binghamton University and a Master of Business Administration from the Kellogg School of Management at Northwestern University. We believe Ms. Wanner's extensive financial experience in business investments and asset management brings significant value to our Board of Directors.

***Former Director Defendant***

34.    Defendant John J. Mack ("Mack") served as a member of the board from January

2019 until his retirement in April 2025.

35.    The 2024 Proxy Statement stated the following about Defendant Mack:

John Mack became a member of our Board of Directors in January 2019. From March 2012 until his retirement in December 2014, Mr. Mack served as a Senior Advisor for Kohlberg, Kravis, Roberts & Co., L.P. Prior to that, Mr. Mack served as Chairman of the Board of Morgan Stanley, a financial services company, from June 2005 to December 2011, and served as the Chief Executive Officer of Morgan Stanley from June 2005 until December 2009, during which time he oversaw the firm's conversion into a bank holding company. Mr. Mack was Co-Chief Executive Officer of Credit Suisse Group from 2003 to 2004 and the President, Chief Executive Officer and a director of Credit Suisse First Boston from 2001 to 2004. He became the President, Chief Operating Officer and a director of Morgan Stanley Dean Witter & Co. in May 1997 and served in that position until 2001. Mr. Mack joined Morgan Stanley in May 1972 in the bond department and served as head of the Worldwide Taxable Fixed Income Division from 1985 to 1992, became a member of the board of directors in 1987, became Chairman of the Operating Committee in March 1992 and became President in June 1993. Mr. Mack is a senior advisor to Morgan Stanley & Co. LLC. Mr. Mack served on the board of directors of LendingClub Corporation from December 2014 to June 2019 and of Glencore plc from June 2013 to April 2021. Mr. Mack holds a Bachelor of Arts degree in History from Duke University. Mr. Mack was chosen to serve on our Board of Directors because of his extensive experience advising and managing banking and financial services companies. We believe that Mr. Mack's strong business leadership experience brings important insight and skills to our Board of Directors.

### Officer Defendants

36.     Defendant Christopher S. Guinta ("Guinta") has served as the Company's Chief Financial Officer of New Fortress since April 2017.

37.     For the 2024 fiscal year, Defendant Guinta received $11,650,718 from the Company. This amount comprised of $350,000 in base salary, a bonus of $6,000,000, and a stock award of $5,300,718. For the 2023 fiscal year, Defendant Guinta received total compensation of $2,000,000 from the Company. This amount comprised of $350,000 in base salary, and an annual bonus of $1,650,000. For the 2022 fiscal year, Defendant Guinta's total compensation was $5,075,008. This included $350,000 in base salary, $3,075,008 in stock awards, and an annual bonus of $1,650,000.

38.     The Company website states the following about Defendant Guinta:

Mr. Guinta has been our Chief Financial Officer since August 2018, and the

Chief Financial Officer of New Fortress Energy Holdings since April 2017. Prior to joining NFE, Mr. Guinta served as Chief Financial Officer of Ranger Offshore Inc. from November 2011 to April 2017. Prior to Ranger, Mr. Guinta served as an associate at SunTx Capital Partners from April 2009 to November 2011. Before joining SunTx Capital Partners, Mr. Guinta served as an associate ate Citi Capital Markets in the Investment Banking Division. Mr. Guinta graduated from The University of Texas at Austin with a Bachelor of Business Administration and a Masters in Professional Accounting.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers, directors, and/or fiduciaries of New Fortress and because of their ability to control the business and corporate affairs of New Fortress, the Individual Defendants owed New Fortress and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

40.    The Individual Defendants were and are required to use their utmost ability to control and manage New Fortress in a fair, just, honest, and equitable manner.

41.    The Individual Defendants were and are required to act in furtherance of the best interests of New Fortress and its shareholders to benefit all shareholders equitably.

42.    Each director and officer of the Company owes to New Fortress and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of New Fortress, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

44.    To discharge their duties, the officers and directors of New Fortress were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

45.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company.

46.    As New Fortress' directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

47.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of New Fortress, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with New Fortress each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

48.    The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, *inter alia*, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

49.    As fiduciaries, the Individual Defendants had a duty to disclose in the Company's

regulatory filings with the SEC all events described in this Complaint that they failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

50.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. Among other things, the Individual Defendants were required to:

a)   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to New Fortress' own Code of Business Conduct and Ethics (the "Code of Conduct");

b)   conduct the affairs of the Company in an efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)   remain informed as to how New Fortress conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

d)   establish and maintain systematic and accurate records and reports of the business and internal affairs of New Fortress and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e)   maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that New Fortress' financial statements

15

and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f)   exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.    Each of the Individual Defendants further owed to New Fortress and the shareholders the duty of loyalty requiring that each favor New Fortress' interests and those of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

52.    At all times relevant hereto, the Individual Defendants were the agents of each other and of New Fortress and were at all times acting within the course and scope of such agency.

53.    The Individual Defendants, through their advisory, executive, managerial, and directorial roles within New Fortress, were privy to detrimental, confidential information concerning the Company.

54.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by New Fortress.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.     In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

57.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

58.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of New Fortress, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

59.     Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly

participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

60.    At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of New Fortress, and at all times operated within the course and scope of that agency.

## NEW FORTRESS' CODE OF BUSINESS CONDUCT

61.    New Fortress' Code of Business Conduct ("Code of Conduct") applies to all officers, directors, and employees of the Company and its subsidiaries. It states the following in the section "Our Expectations," in relevant part:

**We comply**

**Our commitment**

Our Code of Business Conduct is the foundation for building an ethical and accountable workplace.  The Code is applicable to all NFE officers, directors, employees as well as advisors, consultants, business partners, intermediaries and others that conduct business on our behalf.  Compliance with our Code is a condition of employment.  Violations of the Code carry consequences and may result in disciplinary action up to, and including, termination.

**Your responsibilities**

- **Act with Integrity.** Do the right thing, even when no one is watching.
- **Follow the Code.** Read, understand, and adhere to the Code.
- **Adhere to applicable laws, regulations, Company policies and procedures.** Educate yourself on the laws, regulations, and Company policies and procedures applicable to your individual job responsibilities. Be attune to any changes.
- **Ask questions. If you are in doubt about what to do, talk with your manager, Human Resources, Legal or Compliance, or call the Ethics Hotline.**
- **Share concerns.**
    - o Report conduct you believe violates the Code, Company policies of the law.
    - o Speak up without fear of retaliation when you share your concerns in good faith. Good faith means you honestly believe something is wrong.
    - o You may raise a question or concern anonymously 24/7 via phone or the web through our Ethics Hotline.

18



**We hold our leaders to a high standard**

**Our commitment**

Our leaders – officers, directors, and managers – are responsible for setting the tone for an ethical workplace.

**Your responsibilities**

- **Model ethical behavior every day.** Lead by example through words and actions.  Communicate with your employees about what is expected of them under our Code.  Support and encourage training on our Code, Company policies and procedures.

- **Treat employees with dignity and respect**

- **Ethics over results.** Ensure employees and others acting on our behalf know that results are never more important than conducting business ethically. Intervene and stop any violations of our Code, Company policies and procedures, or the law by anyone.

- **Never retaliate.** Create a culture where employees feel comfortable asking for guidance and reporting concerns without fear of retaliation. Support employees who raise issues. Listen to their concerns, treat the information they share with you as sensitive, and disclose only to those who have a business need to as you work to find a solution. Never retaliate or permit retaliation by others against those who report issues or concerns in good faith.

- **Take appropriate action when concerns are raised.**
  - Work with Human Resources, Legal, and Compliance to address legitimate compliance concerns and take prompt corrective action,

19

including documenting and taking appropriate disciplinary actions when needed.
o Consider employee compliance with our Code when evaluating performance.

62.     The Code of Conduct also states the following in the section titled "Our Company,":

**We speak responsibly**

**Our commitment**

We are committed to protecting the NFE reputation and brand.  We use good judgement in every business communication whether it is verbal, written, or digital.

**Your responsibilities**

- **Do not respond to inquiries from the media, investors, analysts, or others unless authorized to do so.**
- **Be professional in all communications**
- **Be responsible when using social media**

**We maintain accurate financial records**

**Our commitment**

We are committed to providing books and records that reflect an accurate picture of NFE's financial performance.  As a publicly traded company, we adhere to all applicable accounting rules and policies, laws and regulations, as well as Company policies and procedures.  Proper financial controls are also in place to protect our assets.

**Your responsibilities**

- **Be accurate, complete, and timely in recording business transactions.**
- **Obtain necessary approvals prior to entering into financial transaction.**
- **Maintain supporting documentation for all transactions.**
- **Cooperate fully with internal and external audits.**
- **Report concerns.** If you believe there are any suspected errors or have concerns about our financial records or internal controls, contact our Chief Accounting Officer, Chief Financial Officer, or Compliance. If you have concerns about questionable accounting of audit matters (e.g., concerns that may involve deficiencies in internal controls, misappropriation or fraud), call the Employee Accounting and Auditing Complaints Hotline found in NFA's Accounting and Auditing Whistleblower Policy.

**We do not trade on inside information**

**Our commitment**

We do not buy or sell stock (including NFE stock) - or tip others that do so - based on material, non-public (inside) information. Material information includes information that, if known by the public, would be considered important in a decision to purchase or sell stock (e.g., projections of future earnings or losses, pricing proposals, unpublished information about a merger,

**Your responsibilities**

- **No insider trading or tipping.**
- **Read, understand, and follow <u>NFE's Insider Trading Compliance Policy</u>.**
- **Contact Legal or Compliance if you have any questions or concerns.**

**We are alert to prevent money laundering and terrorism.**

**Our commitment**

We are committed to complying with the applicable anti-money laundering and anti-terrorism laws. Money laundering is the process of hiding proceeds of criminal activity in legitimate business dealings or using legitimate funds to support criminal activity. We conduct business with reputable third parties that are involved in legitimate business activities and utilize funds from valid sources. We will not proceed with suspicious transactions.

**Your responsibilities**

**• Be alert for offers of cash payments, unusual payment origins, or methods, or any irregularity in the way payments are made.**
**• Do not enter into any contracts or transactions with customers or suppliers until you confirm with Compliance that the required due diligence is satisfactorily complete.**
**• Read, understand, and follow the Company's policies and procedures that prohibit money laundering, and contact Compliance if you have any questions or concerns.**

63.     The Code of Conduct further states the following in the section "Our Relationships":

**We avoid conflicts of interest**

**Our commitment**

We make business decisions that are always in the best interest of NFE. We avoid potential or actual conflicts of interest. A conflict of interest may arise when an employee's personal interests interfere with his or her ability to make an objective decision for NFE.

**Your responsibilities**

- **Identify potential or actual conflicts of interest.** Examples include:
  - You hold a second job that is in the similar line of business as the Company.
  - You invest (or have family and friends invest) in a competitor or a company with which we do business.
  - You receive gifts or entertainment from suppliers that does not comply with NFE policies or the supplier's own policies.
  - You direct business to a supplier that is owned or controlled by family members or close friends.
  - You use NFE resources, equipment, computers, or time for the benefit of your personal business.
- **Disclose any potential or actual conflicts to your manager and Compliance.**
- **Get written approval from Compliance before accepting any Board position with an NFE supplier, competitor, or customer.**

## We build good relationships with our suppliers

**Our commitment**

We value our suppliers because they assist us in meeting customer obligations. We choose our suppliers carefully by vetting them in accordance with NFE policies and procedures. Our suppliers must adhere to the standards set forth in this Code.

**Your responsibilities**

- Read, understand, and follow Company procurement policies and procedures.
- Communicate NFE's expectations and monitor supplier performance.
- Contact Compliance immediately if you learn or suspect that a supplier is acting in a manner that is inconsistent with our Code.

## We comply with international trade laws

**Our commitment**

Because we conduct business across the globe, we must comply with all international laws regulating trade, as well as local import and export laws and regulations. In general, these laws relate to: (i) embargoes and sanctions of entities, individuals, or countries; (ii) necessary licenses and permits applicable to imports and exports; and (iii) boycott requests.

Your responsibilities

- Know with whom you are doing business.
- Be alert to commercial documents requesting a boycott of a certain country and report all such requests to Compliance immediately.
- Ask questions. The international trade laws are very complex and can change quickly, so be sure to contact Compliance with any questions.

## **We have zero tolerance for bribery and corruption**

### **Our commitment**

We comply with anti-bribery and corruption laws wherever we do business.  We neither pay bribes or provide anything of value that may influence (or appear to influence) the judgement or actions of another; nor do we turn a blind eye to suspicions acts of bribery or corrupt conduct.  In addition to our own actions, we are responsible for the actions of third parties if they make corrupt payments on our behalf.

### **Your responsibilities**

- Read, understand, and comply with Company policy and procedures as well as the applicable laws governing anti-bribery and corruption.
- Minimize risks associated with third parties who conduct business on NFE's behalf.
- Contact Compliance if you have questions.

## **We know the rules about gifts and entertainment, sponsorships, charitable donations, social and political contributions**

### **Our commitment**

We believe in building good relationships with our customers, suppliers, and the local communities where we work.  We use good judgment and discretion when giving or receiving gifts and entertainment.  Sponsorships, charitable donations, and social and political contributions on behalf of the Company require pre-approvals.

### **Your responsibilities**

- Read, understand, and comply with NFE's Gifts and Entertainment Policy, and its policies and procedures regarding sponsorships, charitable donations, social and political contributions.

- Do not give or receive lavish gifts or entertainment. Avoid receiving or giving gifts and entertainment that may be perceived as improperly influencing a decision by you or a customer.
- If you have questions, ask your manager or Compliance.

## NEW FORTRESS ENERGY AUDIT COMMITTEE CHARTER

64.  Pursuant to New Fortress' Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its oversight of:

> …the accounting and financial reporting processes of the Company and its subsidiaries and the audits of the financial statements of the Company and to perform such further functions as may be consistent with this Charter or assigned by applicable law, the Company's By-Laws, as amended from time to time, or the Board.
>
> The independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report for inclusion in the Company's Annual Report on Form 10-K is referred to herein as the "independent auditors."

65.  In a section titled "Duties and Responsibilities," the Audit Committee Charter states the following, in relevant part:

## IV.    DUTIES AND RESPONSIBILITIES OF THE COMMITTEE

> In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best address, react or respond to changing circumstances or conditions. The following duties and responsibilities are within the authority of the Committee and the Committee shall perform such duties consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq or any other applicable regulatory authority:
>
> (a)    Be directly responsible for the appointment, compensation, retention and oversight of the work of any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest to services for the Company, and each such registered public accounting firm must report directly to the Committee;
>
> (b)    Review and, in its sole discretion, approve in advance the Company's independent auditors' annual engagement letter, including the proposed fees contained therein, as well as all audit and, as provided in the Act and the applicable rules and regulations promulgated by the SEC thereunder, all permitted non-audit engagements and relationships between the Company and such auditors (which approval should be made after receiving input from the Company's

24

management, if desired). Approval of audit and permitted non-audit services will be made by the Committee or as otherwise provided for in the Audit and Non-Audit Services Pre-Approval Policy;

(c)     Review the performance of the Company's independent auditors, including the lead partner and reviewing partner of the independent auditors, and, in its sole discretion (subject, if required, to shareholder ratification), make decisions regarding the replacement or termination of the independent auditors when circumstances warrant;

(d)     Evaluate the independence of the Company's independent auditors by, among other things:

(i)     obtaining and reviewing from the independent auditors written statements and communications relating to all relationships between the independent auditors and the Company required by applicable auditing standards of the Public Company Account Oversight Board;

(ii)    obtaining and reviewing a report prepared by the independent auditors describing the firm's internal quality-control procedures and any material issues raised by the most recent internal quality control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, involving one or more independent audits carried out by the firm, and any steps taken to deal with any such issues;

(iii)   engaging in a dialogue with the independent auditors with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditors, and taking appropriate action to satisfy itself of the auditors' independence;

(iv)    taking appropriate actions to ensure that the chief executive officer, controller, chief financial officer, chief accounting officer or other person serving in an equivalent position of the Company, was not, within one year prior to the initiation of the audit, an employee of the independent auditor who participated in any capacity in the Company's audit; and

(v)     considering whether there should be a regular rotation of the Company's independent auditors;

(e)     Instruct the Company's independent auditors that they are ultimately accountable to the Committee and the Board, and that the Committee is

25

responsible for the selection (subject, if applicable, to shareholder ratification), evaluation and termination of the Company's independent auditors;

(f)    Review, discuss and, if appropriate, accept the annual audit plan of the Company's independent auditors, including the timing and scope of audit activities and all critical accounting policies and practices to be used, and monitor such plan's progress and results during the year;

(g)    Review and discuss with the independent auditors the results of the yearend audit of the Company, including any comments or recommendations of the Company's independent auditors and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the financial statements of the Company should be included in the Annual Report on Form 10-K;

>    (i)    the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any major issues related thereto;

>    (ii)    critical audit matters arising from the current period audit;

>    (iii)    critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements;

>    (iv)    major issues regarding accounting principles and financial statements presentations, including (A) any significant changes in the Company's selection or application of accounting principles and (B) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of alternative generally accepted accounting principles methods on the Company's financial statements;

>    (v)    alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the auditors;

      (vi)     other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences; and

      (vii)    the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company;

(i)      Review with management and independent auditors, periodically, the following:

      (vi)     all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors;

      (vii)    any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting; and

      (viii)   any significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses;

(j)      Attempt to resolve all disagreements between the Company's independent auditors and management regarding financial reporting;

(k)      Review on a regular basis with the Company's independent auditors any problems or difficulties encountered by the independent auditors in the course of any audit work, including management's response with respect thereto, any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management. In connection therewith, the Committee should review with the independent auditors the following:

      (i)      any accounting adjustments that were noted or proposed by the independent auditors but were rejected by management (as immaterial or otherwise);

      (ii)     any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement; and

(iii)    any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company;

(l)    Confirm that the Company's interim financial statements included in Quarterly Reports on Form 10-Q have been reviewed by the Company's independent auditors;

(m)    Once required pursuant to the applicable rules and regulations of the SEC, review;

(i)    the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function through inquiry and discussions with the Company's independent auditors, management of the Company and the Company's internal auditors; and

(ii)    the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Company's Annual Report on Form 10-K;

(n)    Review with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by the Committee, direct the Chief Executive Officer to assign additional internal audit projects to the Company's internal auditors;

(o)    Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as any financial information and earnings guidance provided by the Company to analysts (which review may be done generally (e.g., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance);

(p)    Review with management the Company's administrative, operational and accounting internal controls, including any special audit steps adopted in light of the discovery of material control deficiencies, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct;

(q)    Receive periodic reports from the Company's independent auditors and management of the Company to assess the impact on the Company of significant accounting or financial reporting developments that may have a bearing on the Company;

(r)    Prepare the audit committee report required by Item 407(d) of Regulation S-K to be included in the Company's annual proxy statement;

(s)    Meet at least annually with the Company's internal counsel and outside counsel (which meeting may occur as part of any Committee meeting) when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Company;

(t)    Prepare the audit committee report required by Item 407(d) of Regulation S-K to be included in the Company's annual proxy statement;

(u)    Review and approve in advance any services provided by the independent auditors to the Company's executive officers or members of their immediate family;

(v)    Review the Company's program to monitor compliance with the Company's Code of Conduct, and meet periodically with the Company's Compliance Officer or other appropriate person to discuss compliance with the Code of Conduct;

(w)    Obtain from the Company's independent auditors any information pursuant to Section 10A of the Securities Exchange Act of 1934;

(x)    Provide for appropriate funding, as determined by the Committee, in its capacity as a Committee of the Board, for payment of:

> (i)    compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services;
>
> (ii)    compensation to any advisers employed by the Committee; and
>
> (iii)    ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties;

(y)    Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

(z)    Secure independent expert advice to the extent the Committee determines it to be appropriate, including retaining, with or without Board approval, independent counsel, accountants, consultants or others, to assist the Committee in fulfilling its duties and responsibilities, the cost of such independent expert advisors to be borne by the Company;

(aa)    Report regularly to the Board on its activities, as appropriate. In connection therewith, the Committee should review with the Board any

issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the Company's internal auditors; and

(bb)    Perform such additional activities, and consider such other matters, within the scope of its responsibilities, as the Committee or the Board deems necessary or appropriate.

*   *   *

While the Committee has the duties and responsibilities set forth in this Charter, the Committee is not responsible for preparing or certifying the financial statements of the Company, for planning or conducting the audit, or for determining whether the financial statements of the Company are complete and accurate and are in accordance with generally accepted accounting principles.

In fulfilling their responsibilities hereunder, it is recognized that members of the Committee are not full-time employees of the Company, it is not the duty or responsibility of the Committee or its members to conduct "field work" or other types of auditing or accounting reviews or procedures or to set auditor independence standards, and each member of the Committee shall be entitled to rely on (i) the integrity of those persons and organizations within and outside the Company from which it receives information and (ii) the accuracy of the financial and other information provided to the Committee, in either instance absent actual knowledge to the contrary.

*   *   *

## FACTUAL BACKGROUND

66.    New Fortress is a U.S.-based liquefied natural gas ("LNG") company. The Company develops, owns, and operates infrastructure related to natural gas and LNG, including liquefaction facilities, LNG vessels, and various logistical assets.

67.    LNG is a highly compressed form of natural gas that can be efficiently transported and later regasified at its final destination. The liquefaction process involves cooling the gas to significantly reduce its volume, enabling easier storage and long-distance transportation. LNG is typically shipped using specialized tankers and is especially useful for delivering energy to regions not connected to natural gas pipeline networks.

68.    New Fortress began trading publicly on the NASDAQ stock exchange in February

2019 under the name New Fortress Energy LLC. In August 2020, the Company transitioned from a Delaware limited liability company to a Delaware corporation and formally changed its name to New Fortress Energy Inc.

69.     Defendant Edens has exercised control over New Fortress since its inception. According to the Company's initial public offering prospectus, Edens and co-founder Defendant Nardone collectively held approximately 90% of the Company following its IPO. Their ownership stake was subsequently diluted as New Fortress conducted additional equity financing and issued new shares into the market. As of December 31, 2022, Edens and Nardone collectively owned and/or controlled approximately 42% of the Company's voting power.

70.     At all relevant times, New Fortress acknowledged its status as a "controlled company" under NASDAQ rules. Edens and Nardone, along with affiliates of Energy Transition Holdings LLC, collectively held a majority of the Company's voting power and possessed the authority to nominate a majority of the board of directors. Pursuant to a shareholder agreement, Energy Transition Holdings LLC was effectively under the control of Edens and Nardone, granting them influence over its shares, which represented approximately 12% to 15% of New Fortress' voting interest during the Relevant Period.

### ALTAMIRA FLNG PROJECT

71.     This action stems from alleged misrepresentations made to investors regarding New Fortress' Altamira FLNG Project (also referred to as the "FLNG 1" project). The Altamira FLNG Project was the first of five planned floating liquefied natural gas (FLNG) units that, according to Edens, were expected to drive the Company's earnings before interest, taxes, depreciation, and amortization ("EBITDA") from breakeven levels to "$2.5 billion plus" within a matter of a few years.

72.     New Fortress officially announced the Altamira FLNG Project in a press release issued on July 5, 2022. Later that same day, Edens provided further details during an investor update call. During the call, Edens described the project, in relevant part, as follows:

> So it's in the Gulf of Mexico. There's a city called Altamira. It's notable from our standpoint, is that a pipeline, a large pipeline runs from Texas subsea to Altamira before it makes kind of a right-hand turn and goes onshore. What we have agreed to do with the CFE [Mexican Comisión Federal de Electricidad] as our partner again is basically build an LNG offshore hub. So I think our initial plan would be to put 2 liquefiers in place there. The CFE would be -- have profits interest in them. So we'll provide the capital but they will basically provide the gas that they'll purchase in -- on our behalf and provide transportation.
>
> They own the firm transport on that pipeline, so they'll basically be -- they're experts in terms of both buying gas and transport. They'll be providing that. That's the partnership. We will then take that gas. It will be obviously already treated gases coming out of the great state of Texas for the most part. So it's in perfect shape to then be processed, turned into LNG that is available for export or potentially they can use it within Mexico, because there's needs for gas in different regions of Mexico. So -- and to see if they'll be our partner there.

73.     Edens contextualized the Altamira FLNG Project by highlighting its strategic importance, stating that it offered New Fortress a "path[] to market for our FLNG products, and that's significant." Analysts quickly identified the project as the most critical of the three transactions outlined by Edens, underscoring its earnings potential. For instance, in a report dated July 6, 2022, titled *Pushing a Heavy Stack of Chips on FLNG*, investment banking advisor Evercore emphasized the project's significance, noting: "New Partnership with Comisión Federal de Electricidad (CFE) NFE will sell CFE the La Paz Power Plant and create a new FLNG hub off the coast of Altamira, Tamaulipas, Mexico for LNG. CFE will source the gas via import pipelines running through Brownsville, Texas, piping cross border U.S. supplied gas. NFE will deploy multiple FLNG units of 1.4 MTPA each that utilize CFE's existing firm pipeline transportation capacity to deliver feed gas volumes to NFE."

74.     Analysts responded favorably to the Altamira FLNG Project as further details became available in the following months. On August 9, 2022, for instance, Evercore raised its price target for New Fortress from $58 to $73 per share in a report titled *The Winds of Commodity Fortune Blowing in NFE's Direction*. In the report, Evercore cited a "faster implied growth rate" driven by additional FLNG opportunities, including the Altamira FLNG Project, as a key factor behind the upward revision. Similarly, on August 12, 2022, JMP Securities increased its price target from $56 to $70 per share, highlighting New Fortress' "meaningful initiatives underway," including the development of the Altamira FLNG Project.

### *NEW FORTRESS INDICATES MECHANICAL COMPLETION IN Q1 2023*

75.     On September 9, 2022, New Fortress, through an indirect subsidiary, submitted an application to the U.S. Department of Energy seeking authorization to: (i) export domestically produced natural gas to the Altamira FLNG Project, and (ii) re-export liquefied natural gas from the project to foreign destinations, including both Free Trade Agreement (FTA) and non-FTA countries. In its application, New Fortress requested approval "by February 2023 so that it may commence exports immediately following completion of construction and in-service of the Project, which is anticipated to occur in the first quarter of 2023." Despite referencing a February 2023 operational timeline, the Company in fact lacked a reasonable basis to expect completion and commissioning of the project within that timeframe. Moreover, it failed to disclose to investors known obstacles that were likely to delay project completion.

76.     Rather than disclosing the challenges associated with completing the Altamira FLNG Project, Defendants made materially false statements throughout the Relevant Period. These statements misrepresented the operational status of the FLNG unit and concealed known

risks that threatened the project's timely completion, risks that, in turn, jeopardized New Fortress' ability to generate anticipated revenue from the project.

77.    Defendants' false statements are detailed in the section titled Defendants' Materially False and Misleading Statements, infra. The first such statement was issued on September 20, 2022, when New Fortress announced plans to host an "FLNG Investor Day" at the a shipyard in Corpus Christi, Texas owned by Kiewit Corporation[1] ("Kiewit"), scheduled for November 2, 2022. In the announcement, Edens was quoted as stating, in relevant part: "[w]e expect to achieve mechanical completion of our first FLNG unit in March 2023 and deploy FLNG 1 into operation by mid-year, with additional units to follow soon thereafter. Utilizing a highly skilled workforce on the U.S. Gulf Coast, we have developed an efficient and repeatable construction process, essentially an FLNG factory, that substantially reduces the cost and time to build incremental liquefaction capacity to meet the urgent needs of the global energy markets."

78.    From there, Defendants' misrepresentations concerning the Altamira FLNG Project intensified in both scope and substance, with resulting impact to the market. For instance, on November 2, 2022, New Fortress leveraged its misleading statements regarding the FLNG unit to revise its 2023 earnings target upward, from $1 billion to "$2.5 billion-plus," in a press release titled *NFE Increases 2022 and 2023 Earnings Goals, Hosts FLNG Investor Day at Shipyard in Texas*. This announcement was met with praise from market analysts.

79.    On November 3, 2022, Evercore released a report highlighting the revision, noting that New Fortress had "increas[ed] guidance for longer-term illustrative potential EBITDA generation to $2.5 billion (from $1.5 billion)." Evercore further commented that although more detailed financial updates were expected in the upcoming third-quarter earnings report on

---

[1] Kiewit is a construction and engineering company that New Fortress retained to construct the FLNG unit and other components of the Altamira FLG Project.

November 8, FLNG remained the primary driver of upside potential for the Company's stock. The report stated: "[o]ur main takeaway from the tour is much of the execution risk, for this highly ambitious gambit, has been removed and the upside case for NFE is coming more clearly into focus."

80.    Emphasizing New Fortress' strategic position, Evercore added: "[w]e urge investors (who may have been waiting on the sidelines before) to take a serious look at NFE now because FLNG, we believe, is coming soon and the broader market doesn't likely fully appreciate the potential upside to NFE. The time to invest is before NFE re-values higher post-completion on FLNG 1."

81.    On November 3, 2022, Jefferies, another analyst, published a report titled *Fast LNG Investor Day Takeaways; PT to $75 from $65*. In the report, Jefferies conveyed increased optimism regarding New Fortress' ability to meet its deployment timeline for the FLNG units. Specifically, the firm stated that it "left Wednesday's Fast LNG investor day and site visit with increased confidence in NFE's ability to deploy its FLNG units on time." Jefferies noted that New Fortress had raised its 2023 EBITDA guidance by $1 billion, largely predicated on FLNG 1 becoming operational by mid-year. The report highlighted that the construction site visit reflected meaningful progress and stated, "[e]xecution on timing continues to be paramount, but NFE appears on pace to capture the hefty price Fast LNG can offer."

82.    Following New Fortress' third-quarter 2022 earnings release, Evercore once again underscored the strategic value of the Altamira FLNG Project. In a report dated November 8, 2022, titled *Just Over the Horizon: An FLNG Rises from the Mexican Gulf*, Evercore reiterated its support for the Company's approach. The report stated, in relevant part: "[w]e continue to favor NFE's strategy of vertical integration into FLNG development, with multiple potential

projects in the U.S. Gulf Coast. . . . NFE is uniquely positioned to build LNG export assets, with relatively unlimited commitments for near-term spot gas production, offering high near-term margin potential."

### ALTAMIRA FLNG DELAYS REVEAL A STARK CONTRAST TO DEFENDANTS' REPRESENTATIONS TO INVESTORS

83.    New Fortress' FLNG Investor Day, held on November 2, 2022, was well-received by analysts and investors alike. As noted in Jefferies' November 3, 2022 report, the event bolstered its "increased confidence" in the Company's ability to "deploy its FLNG units on time." Enthusiasm surrounding the Altamira FLNG Project contributed to a surge in New Fortress' stock price, which climbed to nearly $60 per share in the days following the event.

84.    Unbeknownst to the public, however, the Altamira FLNG Project was descending into disarray. Inadequate planning and inefficient execution steadily eroded the feasibility of meeting the projected March 2023 completion date. These internal deficiencies gave rise to a significant and foreseeable risk that the project would not be finished on time, effectively undermining New Fortress' ability to achieve its stated EBITDA targets.

85.    A former employee, who served as the Commissioning and Start-Up/Simultaneous Operations Lead for the project from March 2021 to February 2023, described the project timeline as extremely aggressive, noting that management had imposed a "vicious schedule" that introduced the potential for safety hazards. By the time he[2] left the Company in February 2023, the same month by which New Fortress had sought operational authorization in its DOE application, the project remained far from completion.

---

[2] Pronouns for former employees throughout this document are random and do not necessarily reflect the gender of that former employee.

86.     According to that same former employee was marked by persistent disorder. The management of the project was described as "chaos," while the timeline for completion was highly ambitious and driven by what he referred to as a "vicious schedule," which introduced significant safety risks. By the time he exited the project in February 2023—the same month New Fortress sought authorization to commence operations—commissioning activities were largely undeveloped. Most of the commissioning work remained incomplete or was only just beginning, yet the FLNG unit was nonetheless transitioned offshore.

87.     Another former employee, who worked as a contractor and pipefitter from June 2022 to November 2023, offered a similar account, characterizing the construction of the FLNG unit as rushed and disorganized. According to this former employee, workers were subjected to intense pressure to meet aggressive deadlines, regardless of whether the tasks at hand had been properly completed. This environment led to incomplete work being advanced solely to expedite the unit's deployment, even though it was not adequately prepared for transition.

88.     The same former employee also highlighted significant sequencing issues arising from the overlap of construction and commissioning activities. Traditionally, commissioning is conducted only after construction has been fully completed. However, in the case of the Altamira FLNG Project, New Fortress directed workers to begin commissioning the unit while construction was still ongoing, creating a disorganized work environment and contributed to project delays.

89.     Industry standards confirm that commissioning an LNG facility is intended to occur only after construction is fully completed. This sequencing allows for the comprehensive testing and optimization of the finished infrastructure before operational launch. Commissioning is designed to ensure the integrity of the constructed facility.[3] The process is both time- and labor-

_____

[3] *See* Martello Expert Services, "Commissioning Clauses in LNG Contracts," https://www.martelloglobal.com/commissioning-clauses-in-lng-contracts/.

intensive, requiring engineers, field technicians, and operations personnel to meticulously examine every aspect of the facility, checking thousands of connections, instruments, valves, and pieces of equipment to confirm proper functionality.[4]

90.    Another former employee of the Company has further explained that commissioning is the critical process of verifying and testing all systems and equipment on the FLNG unit to ensure they function as designed. This process includes key steps such as operating the refrigeration systems, pressure testing pipelines, and performing trial runs. However, due to prolonged construction delays, New Fortress opted to forgo certain essential tests prior to offshore deployment of the unit. For instance, although the Company was scheduled to conduct a "nitrogen run" test while the FLNG unit was still onshore, delays in preparing for the procedure led New Fortress to abandon the test altogether before shipment.  The "nitrogen run" is a fundamental component of the commissioning phase. It involves circulating nitrogen gas through the unit's pipelines and equipment to simulate actual operating conditions. This test is intended to confirm that the systems are free of leaks and are functioning correctly prior to introducing natural gas into the unit.

91.    According to the former employee, poor planning and inadequate oversight throughout the project led to significant safety concerns on-site. New Fortress prioritized meeting aggressive deadlines over ensuring the well-being of its workers. This pressure-driven environment, coupled with a lack of proper tracking and monitoring during the construction phase, further compounded the issues and heightened operational risks.

92.    Yet another former employee, who served as a Completions Handover Contractor from September 2022 to December 2023, reported that additional delays stemmed from New

---

[4] *See* Matrix PDM Engineering, "Startup and Commissioning Your Natural Gas Processing Facility," https://www.matrixpdm.com/start-up-and-commissioning-your-natural-gas-processing-facility.

Fortress' decision to utilize repurposed jack-up rigs for the FLNG project. Moreover, the rigs were outdated, and many of their critical components—such as piping systems—were in deteriorated condition. Consequently, New Fortress was required to replace more components than initially anticipated. The former employee further noted that the construction of these rigs remained incomplete at the time of their offshore deployment, and it was "well-known" among personnel that the project was significantly behind schedule while still onshore.

93.     The same former employee also attributed the project delays to the establishment of knowingly unrealistic deadlines. The timeline for the Altamira FLNG Project was in constant flux, lacking a coherent plan for how and when the necessary work would be completed. Construction progress was discussed in weekly status meetings led by Kenneth Withers, who was responsible for overseeing completions tracking on behalf of Kiewit Corporation. Moreover, the construction updates shared during these internal meetings frequently conflicted with the timelines and assurances that New Fortress was publicly communicating to investors and stakeholders.

94.     Another former New Fortress employee, who served as Commissioning and Startup Manager from June 2022 to February 2023 and as Vice President of Commissioning and Startup from February 2023 to December 2024, stated that the FLNG Investor Day held on November 2, 2022, was intentionally staged to convey a misleading impression of progress on the Altamira FLNG Project. According to this person, New Fortress removed the main turbines from Siemens' manufacturing facility approximately three months before their completion in order to present the illusion of advanced development to investor day attendees, which included analysts responsible for reporting to investors on the project's status. To reinforce this narrative, the turbines were transported to the Kiewit construction site in Corpus Christi to give the

appearance that they had been fully assembled. In reality, New Fortress had arranged with Siemens to complete the turbine construction on-site at the Kiewit yard. Furthermore, Garrett Lam, a project engineer at New Fortress, led attendees through the site during the investor day, presenting an overstated depiction of the project's progress. In truth, the portrayal significantly misrepresented the actual status of the Altamira FLNG Project.

### COMPLETION DELAYS MOUNT AS MANAGEMENT DOWNPLAYS OPERATIONAL FAILURE

95.    A stark contradiction emerged between Edens' representations to investors and the actual conditions at the Altamira FLNG Project construction site in Corpus Christi, Texas. While Edens promoted the project as having "developed an efficient and repeatable construction process – essentially an FLNG factory," frontline personnel at New Fortress described a drastically different reality. According to those working on-site, the project had already devolved into disarray and was being executed in a manner that posed serious safety risks, with some warning of the potential for a catastrophic failure.

96.    Investors were kept unaware of the true status of construction and the actual timeline for completion of the Altamira FLNG Project. According to a former Vice President at New Fortress, the Company's financial models were heavily reliant on the timely delivery of the Altamira project. Consequently, acknowledging any delay would have required New Fortress to revise its revenue projections downward—an outcome the Company appeared intent on avoiding.

97.    This was exemplified on February 28, 2023, when New Fortress revised its full-year earnings guidance downward from $2.5 billion to $2 billion, citing a shift in the Altamira FLNG Project's mechanical completion date from March to May 2023. Despite this adjustment, the Company still did not disclose the underlying construction challenges it had already encountered—and continued to face—at the project site. Instead, New Fortress assured investors

that production would commence in July 2023, even though neither the revised completion timeline nor the projected production start date had any reasonable foundation, given the actual conditions on the ground at the construction site.

98.    Rather than acknowledging the known construction issues, New Fortress proceeded to ship the unfinished FLNG unit offshore in July 2023. The unit, consisting of three rigs referred to as Pioneer 1, 2, and 3, was deployed despite being incomplete. Multiple witnesses confirmed that significant portions of the unit remained unfinished at the time of its offshore transfer.

99.    The Company's firmer Commissioning and Startup Manager, who served in that role from June 2022 to February 2023 and subsequently as Vice President of Commissioning and Startup through December 2024, explained that the decision to send the FLNG unit and its associated rigs offshore prior to the completion of construction was driven largely by escalating costs at the Kiewit construction site in Corpus Christi, Texas. She attributed these rising expenses to widespread inefficiencies among subcontractors, which made project timelines increasingly difficult to manage. Describing the construction site as a "mess," she noted that the schedule was continually slipping while costs "skyrocketed." Ultimately, Edens made the decision to move the FLNG unit and rigs offshore before construction was complete.

100.    The Company's former Completions Handover Contractor, who held that role from September 2022 to December 2023, confirmed that the FLNG unit was in an "incomplete state" at the time it was sent offshore. According to him, several critical systems had not been finalized, including the electrical systems and potable water systems, and hydrotesting had not yet been completed.

101.    That same employee explained that it was widely understood among personnel working on the rigs that the FLNG unit was incomplete when it was shipped offshore. He used a project tracking system known as MC Plus to monitor the status of various installations on the FLNG unit. This system tracked key milestones such as equipment installation, hydrotesting of piping systems, and the mechanical completion of individual subsystems. Progress updates from MC Plus were also reviewed during weekly tracking meetings led by Kenneth Withers, who was responsible for completions tracking at Kiewit Corporation. Both the system data and meeting discussions consistently underscored the significant amount of unfinished work—particularly in areas that were deferred for completion offshore.

102.    FE1, who served as FLNG Startup Manager from January 2023 to November 2023 and as LNG Compression Commissioning Lead from November 2022 to December 2022, identified a critical test that remained incomplete when the FLNG unit was shipped offshore— the "nitrogen run" test. This test is essential for verifying the unit's readiness for safe operation prior to the introduction of natural gas. Although New Fortress initially planned to conduct the test onshore, project delays prompted the Company to abandon that plan and proceed with offshore deployment before the test was completed. According to FE1, New Fortress made the decision to forgo the nitrogen run in order to avoid missing the publicly stated target completion date.

103.    Former employees also further confirmed that each of the rigs comprising the FLNG unit was deployed offshore prior to being fully constructed and before completing the critical "nitrogen run" test, which had originally been planned for onshore execution. Based on the construction status at the time, one stated that the rigs were not fit for offshore deployment, as they remained under active construction. This decision not only compounded already

substantial construction delays but also significantly hindered the commissioning process. While the onshore workforce consisted of approximately 3,000 workers, offshore operations were limited to a much smaller team of around 300. By relocating the unfinished rigs offshore, New Fortress imposed severe constraints on the project's ability to complete construction and commissioning efficiently, further exacerbating the delays.

104.     Delays were further compounded by New Fortress' decision to terminate Fluor Corporation ("Fluor"), an engineering and construction firm that New Fortress had hired to perform engineering services for the Altamira FLNG Project, just as the Company was preparing to ship the FLNG unit offshore. According to a former employee, Fluor served as the engineering, procurement, and construction (EPC) contractor for the Altamira FLNG Project. New Fortress terminated Fluor's involvement in mid-2023, resulting in the loss of experienced commissioning personnel at a pivotal stage of the project. Following Fluor's termination, New Fortress was unable to adequately replace the skilled engineers and specialists who had been critical to the commissioning process.

105.     A contractor and pipefitter who worked for the Company from June 2022 to November 2023, provided further evidence that the FLNG unit was incomplete at the time of its offshore deployment. Just prior to shipment, a critical malfunction occurred in the gear system of one of the jack-up rigs. Specifically, a gear responsible for controlling the rig's elevation—allowing it to raise and lower—failed during testing. According to the former contractor, the rig was required to be fully operational before being transported offshore, and this malfunction underscored the unit's unprepared state at the time of deployment.

106.     In addition to the jack-up gear malfunction, the same contractor reported that a substantial portion of the piping work remained unfinished when the FLNG unit was shipped

offshore. Numerous cleanouts and critical connections, particularly in the vessel areas located at the bottom of the rig, were still incomplete. He described the situation as "a mess," noting that workers faced confusion in distinguishing between materials designated for demolition and those intended for installation. This disorganization further underscored the unit's unprepared state at the time of deployment.

107.    The contractor described the construction and commissioning efforts for the FLNG unit as "completely unorganized," emphasizing that the unit was still under construction when it was shipped offshore. Some of the delays were attributed to known material shortages. For instance, throughout the summer of 2023, construction was stalled for several months while New Fortress awaited delivery of 1,000-pound valves essential to the unit's operation, components that had not yet been procured. According to him, the lack of planning and sequencing that led to these delays was atypical compared to other projects he had worked on during his tenure with Kiewit Corporation.

108.    Another former employee, who served as a Commissioning and Startup Engineer from July 2022 to June 2023, reported that significant portions of the FLNG unit remained incomplete as of June 2023, most notably, the marine scope. According to FE9, the marine scope was "a mess." This component comprises critical rig infrastructure essential to maintaining the FLNG unit's buoyancy and structural integrity, ensuring that it remains afloat and does not sink.

109.    The same person stated that as of June 2023, the marine scope of the FLNG unit was far from complete. Compounding the issue was the fact that the FLNG rigs had been repurposed, and due to evolving regulatory standards, they were no longer compliant with current requirements. These deficiencies were repeatedly communicated to the then Vice President of Commissioning and Startup for the Altamira FLNG Project. These concerns were raised during

daily, or at times bi-daily, meetings held at the Corpus Christi construction site. During these meetings, Breffni Allen, directly informed this person that the unit was not ready for offshore deployment.

110.    The Telecommunications Lead from November 2023 to February 2024 confirmed that several critical safety and compliance systems—including public announcement systems, general alarm systems, and navigation radars—were nonfunctional upon arriving at the Altamira FLNG Project in November 2023. She described the project environment at that time as "chaotic" and poorly managed, noting that many components of the FLNG unit were either only partially completed or entirely missing. During an initial assessment in the first week on-site, she observed crates of uninstalled equipment scattered across the deck. According to her, the FLNG unit had been deployed offshore prematurely, with essential systems left incomplete, a decision that significantly increased the project's complexity and cost, as offshore labor is typically three to four times more expensive than onshore labor.

111.    Following the discovery that several critical systems on the FLNG unit were nonfunctional, the insurance consortium supporting the project dispatched a team of inspectors from Lloyd's Register Group Limited to assess the situation. The inspectors were tasked with verifying that the FLNG unit met the minimum safety standards necessary for maritime classification and continued insurance coverage. Upon inspection, the team confirmed that the unit's systems were out of compliance. In response, the insurance consortium issued a formal warning letter to Andrew Couch, the Managing Director overseeing the FLNG unit's construction. According to the Former Telecommunications Lead, the letter was sent shortly after the rigs were deployed offshore and provided New Fortress with a one-month deadline to resolve the identified compliance issues or face potential termination of insurance coverage. She reported spending the

majority of his time on the Altamira FLNG Project working to address the deficiencies outlined in the inspection team's findings.

112.    The same former employee, who had prior experience working on other deepwater platforms, characterized the state of the FLNG unit for the Altamira FLNG Project as "insane," noting that it had not been fully constructed as of November 2023, despite already being deployed offshore. According to her, the project was further hampered by significant staffing shortages, particularly in critical areas such as operational technology and distributed control systems. These shortages led to delays in the calibration and integration of control systems with the unit's physical equipment, further compounding existing project challenges.

***MOUNTING SETBACKS AT THE ALTAMIRA FLNG PROJECT***

113.    New Fortress failed to disclose the incomplete status of the FLNG unit prior to its offshore deployment, as well as the significant obstacles and delays that hindered its completion once the Altamira FLNG Project was at sea. Rather than informing investors of these setbacks, the Company opted to subtly revise its projected timelines for completion and production through quarterly earnings reports and various press releases, without providing transparent explanations for the delays.

114.    As detailed further below (see Defendants' Materially False and Misleading Statements, infra), Defendants continued to misrepresent the status of the Altamira FLNG Project and withheld material risks related to its timely completion and New Fortress' ability to generate revenue. For example, on February 29, 2024, during the Company's fourth quarter and year-end 2023 earnings announcement (4Q23), New Fortress informed investors that it now expected production to begin in March 2024, postponed from the previously projected September 2023, and sales to commence in April 2024 instead of the originally anticipated October 2023. During

the corresponding earnings call, Edens sought to minimize the significance of these delays, characterizing the project's completion as having only "been a little bit delayed."

115.   Similarly, on May 8, 2024, while announcing its financial results for the first quarter of 2024, New Fortress further extended its projected timelines—pushing the expected start of production to May 2024 and the commencement of sales to June 2024. Subsequently, in a press release issued on July 23, 2024, announcing the closing of new financing, the Company briefly noted that liquefaction had been completed a few days earlier and that it now anticipated sales would begin in August 2024.

116.   The investor updates issued by New Fortress, detailed below, obscured the actual conditions at the Altamira FLNG Project and effectively deprived investors of the ability to assess the true risks associated with their investment. According to a former Vice President at the Company, efforts to finalize service and repair contracts for the FLNG unit were intentionally delayed under the direction of senior management. These contracts, which are essential to ensuring readiness for commercial operations, typically need to be in place several months in advance. However, the persistent delays in achieving operational status for the FLNG unit continually hindered their execution. By January 2024, the former Vice President was instructed by Guinta to postpone finalizing these agreements due to ongoing uncertainty around the project's start date. As of June 2024, she remained under directive not to proceed with service and repair contracts, as management still lacked a definitive timeline for when the FLNG unit would become operational.

117.   The former Commissioning and Startup Manager (from June 2022 to February 2023) and subsequent Vice President of Commissioning and Startup (through December 2024), confirmed that by December 2023, it was already evident internally that the Altamira FLNG

Project would not be commissioned by the publicly stated target of March 2024. Despite executive assurances to the contrary, construction on the FLNG unit remained significantly incomplete through the end of February 2024. The former employee further noted that a substantial number of punch list items were still outstanding at that time, including numerous items designated as "Priority A"—indicating they were critical to achieving commissioning and operational startup.

118.    According to the same person, as of February 2024, New Fortress still had "hundreds of Priority A punch list items open"—tasks that were essential to complete before the Company could "even think about startup." He noted that records maintained by Fluor would reflect the outstanding items at that time. Even by late March 2024, major installation work was still in progress, including critical activities such as structural steel erection, insulation, and painting. He further emphasized that construction remained active during the commissioning phase, with tasks like welding and painting continuing alongside efforts to prepare the FLNG unit for operational readiness.

119.    A former Marine Operations Manager, who worked for the Company from April 2024 to August 2024—and in a similar capacity as a contractor beginning in January 2024—explained that delays in completing construction prior to the onset of winter subjected the project to additional setbacks due to seasonal storms between January and March 2024. This former employee was responsible for coordinating the transportation of materials and personnel to the FLNG unit offshore, but reported that weather-related disruptions prevented successful delivery on at least five separate occasions. During periods of severe weather, port authorities would close access, forcing interruptions in the supply chain. According to her, operations could not resume until wave heights and wind speeds returned to safe, acceptable levels for marine transport.

120. The former employee who served as a Gas Treatment Operator from January 2024 to December 2024, arrived at the Altamira FLNG Project in January 2024 and immediately observed that the project was far from completion—contrary to the representations made by Defendants to investors. He expressed shock at the state of the equipment during an initial tour of the FLNG unit. For example, the mixed refrigerant system was not yet secured, with piping left hanging loosely in various locations. Crucial components, such as the mixed refrigerant compressor—an essential element for the liquefaction of natural gas—had not been commissioned upon his arrival. That compressor was not commissioned until May 2024 and did not become fully operational until August 2024. Additional deficiencies included the absence of a functional firewater system and the lack of power from the rig's primary turbine generators, which were inoperable at the time. The rig was temporarily powered by emergency generators, as the main generators did not become operational until late March or early April 2024. Other critical systems, including the LNG Boil-Off Gas Compressor and the Hot Oil System, were also incomplete and untested. The Hot Oil System, in particular, experienced recurring issues, with a faulty pump malfunctioning on four separate occasions, each requiring repair and contributing to further delays in commissioning. According to him, virtually none of the unit's systems had been commissioned as of February 2024.

121. During a tour of the FLNG unit in February 2024, the same former employee inquired about New Fortress' projected timeline for first liquefied natural gas (LNG) production and was told that the Company anticipated production would begin in April 2024. He immediately expressed doubt, noting that the timeline was off by several months, as commissioning had yet to begin and construction crews were still actively installing piping systems. A similar conversation took place in January 2024 between this former employee and Johnie Boutwell, New Fortress'

Operations and Maintenance Training Manager. During that exchange, Boutwell acknowledged that commissioning would not be completed as scheduled, citing that the FLNG unit was undergoing a "turnaround"—a process involving the complete shutdown of equipment to conduct extensive maintenance and address multiple system issues.

122.    According to the same person, as of February 2024, the Altamira FLNG Project remained in the pre-commissioning phase, with key equipment still in the process of being installed. By March 2024, significant systems—including the acid gas removal unit—were still incomplete. Construction activity continued, with pumps being installed and various pieces of piping scattered across the deck. On April 26, 2024, a major incident occurred when an explosion damaged a critical component of the LNG refrigeration process. Specifically, one of the cold boxes—used to cool and liquefy natural gas, exploded during a pressure test. The blast caused the cold box's internal aluminum piping to rupture, dispersing small particles of perlite insulation across the FLNG unit platform. The internal piping sustained significant damage, and repairs to the unit extended for approximately one month. The following image shows the ruptured paneling of the cold box as a result of the explosion:



123.    The explosion caused a significant setback to construction efforts and prompted management to reassess project timelines, ultimately shifting their approach to focus on one task

at a time. According to the same former employee, substantial work remained outstanding at the time of the incident. Critical systems—including the mixed refrigerant compressor, the boil-off gas compressor, and the heavy hydrocarbon removal unit—had yet to be commissioned. Given the volume and complexity of work still required, he stated that it was not feasible for New Fortress to begin liquefied natural gas (LNG) production within 72 hours, as claimed by Guinta during the Company's quarterly conference call on May 8, 2024. In fact, the commissioning of the heavy hydrocarbon removal unit did not begin until late July 2024. Notably, on July 9, 2024, a leak was still detected during a leak check on the "scrubs column bottom pump," a preliminary step in the commissioning process. The following image captures the leak observed during testing on July 9, 2024:



124.    The same person attributed a significant portion of the delays at the Altamira

FLNG Project to New Fortress' decision to bypass critical pre-commissioning steps onshore and

prematurely deploy the FLNG unit offshore. According to him, approximately 85% of the

project's delays stemmed from issues that would have been addressed during a proper onshore

pre-commissioning phase. For instance, during a test on the pre-treatment side of the unit, workers

discovered a radio battery lodged inside a valve. Additional inspections during commissioning

revealed various debris, including rocks, caution tape, and other foreign materials, inside pipes

and strainers. He emphasized that such issues would have been identified and resolved during

onshore pre-commissioning, had the process been properly executed. In particular, nitrogen

testing conducted onshore would have cleared this debris prior to the unit's offshore deployment, helping to avoid many of the complications encountered later in the project.

125.    He also cited chronic understaffing at the Altamira FLNG Project as a key factor contributing to the disorganization and inefficiencies on-site. The former Vice President of Commissioning and Startup for the project was reportedly working exhaustive hours, regularly covering both day and night shifts from 8:00 a.m. to midnight without taking days off and this unsustainable workload led to growing disorganization across the project. As the former Vice President became increasingly overextended, he ceased conducting key coordination meetings, including the 30-minute daily update briefings and "Permit to Work" meetings, which were essential for informing personnel about authorized work activities and safety protocols. In addition, because the former Vice President was constantly on-site, he frequently reassigned contractors mid-task, leading to a pattern of unfinished work. For example, contractors would begin commissioning the regeneration gas compressor, only to be redirected by the former Vice President to a different task before making substantial progress.  The project also suffered from a lack of full-time engineering support. Following the cold box explosion, Chart Industries deployed a dedicated team to remain on the rig until October 2024, and Honeywell sent an engineer to oversee testing of the acid gas removal unit. Outside of these isolated instances, however, according to those employed there at the time, the absence of consistent engineering personnel exacerbated the existing chaos and further hindered project execution.

126.    The staffing challenges at the Altamira FLNG Project were further compounded by extremely poor living conditions on the offshore rigs. According to the former Gas Treatment Operator mentioned above, who has worked at approximately 50 facilities across the Gulf of Mexico, the conditions at the Altamira site were the worst he had ever experienced. One of the

most severe issues was the presence of mold in the living quarters, which management did not address until August or September 2024. Overcrowding further exacerbated the situation. The rigs were originally designed to accommodate around 120 individuals, yet more than 300 personnel were housed there, with many placed in temporary accommodations such as "float tails" and "lift boats." During work shifts, the sheer number of people on the FLNG unit created a disorganized and congested environment that a former employee repeatedly described as "chaotic."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

*SEPTEMBER 20, 2022*

127.    On September 20, 2022, New Fortress issued a press release titled *NFE Schedules FLNG Investor Day in Texas*. It included the following relevant excerpt:

> NEW YORK--(BUSINESS WIRE)--Sep. 20, 2022-- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") announced today that the Company plans to host an FLNG Investor Day at the Kiewit Offshore Services ("KOS") shipyard near Corpus Christi, Texas, on Wednesday, November 2nd, 2022, beginning at 10:00 A.M. Central Time. Specializing in the fabrication and integration of offshore projects, the 555-acre KOS facility is home to NFE's FastLNG program and the ongoing conversion of marine infrastructure into floating liquefaction units.
>
> "With our partners at Kiewit, we look forward to hosting investors and analysts at this world-class facility in Texas," said Wes Edens, Chairman and Chief Executive Officer of NFE. "***We expect to achieve mechanical completion of our first FLNG unit in March 2023 and deploy FLNG 1 into operation by mid-year***, with additional units to follow soon thereafter. Utilizing a highly skilled workforce on the U.S. Gulf Coast, ***we have developed an efficient and repeatable construction process – essentially an FLNG factory – that substantially reduces the cost and time to build incremental liquefaction capacity*** to meet the urgent needs of the global energy markets."

(Emphasis added).

128.    The emphasized statements above were materially false and/or misleading when made because: (a) New Fortress and Edens neither expected nor had a reasonable basis to expect that "mechanical completion" would be achieved by March 2023 or that FLNG 1 would be

"deployed into operation" by mid-year 2023; (b) at that time, New Fortress had not "developed an efficient and repeatable construction process" for LNG facilities, contrary to its public statements; and (c) the statements omitted the following known, material non-public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) construction was not proceeding efficiently; instead, it was hindered by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays caused by the lack of timely procurement of essential components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (4) by neglecting standard safety protocols and pressuring employees to prioritize speed over proper procedure, the Company fostered an environment that jeopardized worker safety and increased the likelihood of equipment failures, further contributing to delays in the Altamira FLNG Project.

129. The actual conditions at the Corpus Christi construction site for the Altamira FLNG Project were described by former employees as marked by "chaos." Contrary to New Fortress' claim that it had "developed an efficient and repeatable construction process – essentially an FLNG factory," the project was plagued by disorganization, poor oversight, and inefficiencies. Former employees reported that these conditions not only disrupted workflow but also created significant safety hazards throughout the site.

***OCTOBER 28, 2022***

130.    On October 28, 2022, New Fortress issued a press release titled *NFE Finalizes Agreements with CFE in Mexico, Including Plans for Offshore FLNG Hub Near Altamira*. The press release stated, in relevant part, as follows:

> NEW YORK--(BUSINESS WIRE)--Oct. 28, 2022-- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") announced today that it has finalized its agreements with Comisión Federal de Electricidad ("CFE") as part of a growing strategic alliance supported by His Excellency Andrés Manuel López Obrador, the President of Mexico, and by Manuel Bartlett, the CEO of CFE.
>
> .  .  .
>
> NFE and CFE are collaborating on the creation of a new FLNG hub off the coast of Altamira, Tamaulipas.
>
> Pursuant to the now finalized agreements, NFE will deploy multiple FLNG units of 1.4 MTPA each that utilize CFE's existing firm pipeline transportation capacity on TC Energy's Sur de Texas-Tuxpan Pipeline to deliver feedgas volumes to NFE.
>
> NFE's first FLNG unit, which is under construction at the Kiewit Offshore Services shipyard near Corpus Christi, Texas, is currently expected to ***achieve mechanical completion in March 2023***, and will be delivered to Altamira for commencement of operations soon thereafter.

(Emphasis added).

131.    The emphasized statements above were materially false and/or misleading. New Fortress did not anticipate, and had no reasonable basis to anticipate, achieving "mechanical completion" by March 2023.Furthermore, the statements omitted the following known, material non-public information that was necessary to ensure the statements were not misleading under the circumstances in which they were made: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to

procure necessary components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) the decision to deploy repurposed, used jack-up rigs exposed the Company to additional construction delays, as the operability of critical components had not been verified and many parts required replacement; and (4) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

***NOVEMBER 2, 2022***

132.    On November 2, 2022, New Fortress hosted its FLNG Investor Day at the construction site for the Altamira FLNG Project in Corpus Christi, Texas. That same day, the Company issued a press release titled *NFE Increases 2022 and 2023 Earnings Goals, Hosts FLNG Investor Day at Shipyard in Texas*. The press release stated, in relevant part, as follows:

> NEW YORK--(BUSINESS WIRE)--Nov. 2, 2022-- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") announced today at its FLNG Investor Day in Texas that the Company is raising its full year 2022 Illustrative Adjusted EBITDA Goal to ~$1.1 billion (from $1.0+ billion) and its **full year 2023 Illustrative Adjusted EBITDA Goal to ~$2.5+ billion (from $1.5+ billion)**.
>
> The increases in NFE's illustrative goals are due to portfolio optimization and higher operating margins in our core business lines, as well as – most significantly– **the expected on-schedule deployment of our first floating liquefaction unit ("FLNG 1") in the first half of 2023.**
>
> .  .  .
>
> NFE is hosting its FLNG Investor Day today at the Kiewit Offshore Services ("KOS") shipyard near Corpus Christi, Texas. Specializing in the fabrication and integration of offshore projects, the 555-acre KOS facility is home to NFE's Fast LNG program and the ongoing conversion of marine infrastructure into floating liquefaction units.
>
> **"We are proud of the efficient and repeatable process we have developed – essentially an FLNG factory – that substantially reduces the cost and**

**time to build incremental liquefaction capacity** the global energy market so urgently needs," continued Mr. Edens. "We are pleased to host investors and analysts today at this world-class facility in Texas, where they have an opportunity to see the significant progress we are making toward mechanical completion of our first FLNG unit in March 2023."

(Emphasis added).

133.     The emphasized statements above were materially false and/or misleading. New Fortress did not, at that time, expect, nor did it have any reasonable basis to expect "on-schedule deployment" of the Altamira FLNG Project. Furthermore, at that time, New Fortress had not "developed an efficient and repeatable construction process" for LNG facilities, contrary to its public statements. Moreover, the statements omitted the following known, material non-public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) the EBITDA projections communicated to investors were dependent on the timely construction, commissioning, and operation of the Altamira FLNG facility, an outcome that, at the time, was highly unlikely if not impossible to achieve; (2) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (3) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (4) as described by a former employee, New Fortress created the false impression that project progress was more advanced than it actually was by, among other tactics, presenting key components, such as the FLNG unit's turbines, as completed when, in reality, they were still unfinished; (5) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; (6) by neglecting standard safety measures and pressuring employees to rush construction at all costs,

the Company created an environment that not only endangered worker safety but also increased

the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

***NOVEMBER 8, 2022***

134.    On November 8, 2022, New Fortress reported its financial results for the third

quarter of 2022 (3Q22). In connection with the announcement, the Company issued a press release

and held an investor conference call. The press release,, titled *New Fortress Energy Announces*

*Third Quarter 2022 Results*, stated, in relevant part, as follows:

> NEW YORK--(BUSINESS WIRE)--Nov. 8, 2022-- New Fortress Energy Inc.
> (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results
> for the third quarter of 2022.
>
> .   .   .
>
> We are on track to achieve our Illustrative Adjusted EBITDA Goal of ~$1.1
> billion for 2022
>
> Recently announced increase of 2023 Illustrative Adjusted EBITDA Goal to
> ~$2.5+ billion (from ~$1.5+ billion), and Illustrative Adjusted EBITDA
> Goals of ~$4+ billion and ~$5+ billion for 2024 and 2025, respectively
>
> ***Increase in 2023 earnings goals driven primarily by expected Deployment
> of FLNG 1 in the first half of 2023***, as well as higher expected operating
> margins and continued LNG portfolio optimization
>
> .   .   .
>
> ***Construction of our Fast LNG units is progressing rapidly with the first
> FLNG unit expected to achieve Mechanical Completion in March 2023 and
> commence Operations by mid-2023.***

(Emphasis added).

135.    The emphasized statements above were materially false and/or misleading. At that

time, New Fortress did not expect, and had no reasonable basis to expect, the "Deployment" of

the Altamira FLNG Project within the first half of 2023. Also at that time, New Fortress had not

"developed an efficient and repeatable construction process" for LNG facilities, contrary to its

public statements. Moreover, the statements omitted the following known, material non-public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) the EBITDA projections communicated to investors were dependent on the timely construction, commissioning, and operation of the Altamira FLNG facility, an outcome that, at the time, was highly unlikely if not impossible to achieve; (2) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (3) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (4) as described by a former employee, New Fortress created the false impression that project progress was more advanced than it actually was by, among other tactics, presenting key components, such as the FLNG unit's turbines, as completed when, in reality, they were still unfinished; (5) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; (6) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

136.    Edens and Guinta participated in the investor conference call on November 8, 2022. During the investor conference call, Guinta stated in pertinent part as follows:

> **The first unit will begin operations in May or June 2023**, and then the remaining 5 will turn on before the end of September 2024, so less than 2 years from now. This will result in 161 TBtu in volumes next year, growing to 464 TBtu for 2025.

Now let's turn to Slide #10 and talk about the progress in FLNG. As you know, and many of you attended, we hosted an investor and an analyst event last week in Kiewit shipyard in Corpus Christi, and it's a great opportunity for us to give investors a glimpse of the progress we have made. As we mentioned on site, nothing that we're doing is overly complicated or difficult, but it does require the team to be organized, efficient and accountable to one another.

The 2 key takeaways from the event last week and the highlights of the quarter are: one*, we are making excellent progress on FLNG #1 and expect to achieve mechanical completion on March 17 and then have the asset deployed and operating in May and COD in June 2023.*

Second, we made huge progress in the deployment options, including permits for our various locations, which we'll outline in a couple of slides. As mentioned, *our FLNG 1 is rapidly approaching completion*. On the modules in the top left of this page, there's a picture showing where we assemble the modules that will be lifted under the jack up rigs. Module 1 for gas treatment goes on the first rig, module 2 the liquefaction goes onto the second rig and then we'll have 1 smaller module for utilities and accommodations that goes on to the third rig. Each of these large modules will be 4 to 7 levels high, when completed will weigh over 5,000 tons.

Below is a picture of the jack up rigs where the modules will be installed. We've completed the demolition and are nearing the completion of the whole strengthening and enhancements to the foundation as well as a complete overall and upgrade of the marine systems.

Further, we're in the middle of preparing for deployment and operations once the FLNG construction has been completed. *We've hired our commissioning team that's working to commission as much of the asset in the yard as possible. Once the system is completed, we can work to activate and test immediately.*

Regarding installation, we're doing things to have all subsea tie-ins, pipelay, mooring, riser work completed in order to ensure that once the FLNG is on site, we can immediately begin operations. And in operations itself, our team of people has already begun training and simulations to be ready to operate the asset once it's on location.

(Emphasis added).

137. The emphasized statements above were materially false and/or misleading. At that time, the Altamira FLNG Project was not "rapidly approaching completion," contrary to what was publicly stated. Furthermore, New Fortress did not, at that time, expect, nor did it have any

reasonable basis to expect, "mechanical completion" by March 2023 or achievement of a Commercial Operations Date (COD) in "May or June 2023." Moreover, the statements omitted the following known, material non-public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) commissioning could not meaningfully or properly proceed, as the construction of major systems had not yet been completed; (2) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (3) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (4) as described by a former employee, New Fortress created the false impression that project progress was more advanced than it actually was by, among other tactics, presenting key components, such as the FLNG unit's turbines, as completed when, in reality, they were still unfinished; (5) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; (6) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

### DECEMBER 13, 2022

138.    On December 13, 2022, New Fortress hosted a special investor conference call to discuss its decision to issue a $3.00 per share dividend. Edens and Guinta participated in the call

on behalf of the Company. During the call, Edens stated, and had follow-up dialogue with a

stakeholders, in relevant part, as follows:

> So in fact, if you look at Page #6, this gives a very kind of vivid depiction of this. 2019, our adjusted EBITDA, negative $115 million, that was in the growth stage of the company. 2020, we basically broke even, made $33 million. Last year, $605 million. This year, approximately $1.1 billion. And then next year in years forward, it goes up materially now, so $2.5 billion plus next year and beyond that in 2024. The CapEx on the bottom line is impressive. We actually invested $377 million in 2019, $157 million in 2020. And then last year and this year, those numbers have increased substantially. $669 million last year, $800 million to $900 million this year, $2 billion plus.

> There's -- it's not like 39% and 61% was the wrong number or 60-40 is absolutely the correct one. But what it does is when we look at the planned expenditures that we've got for CapEx, we can see that we can fund ourselves very readily with the liquidity and the cash on hand and the earnings that we have and still allow for a meaningful dividend. And so that's the judgment that we're making at the end of the day. ***It is not, by my measure, an aggressive policy whatsoever. I think that with the business environment that we're in, with the position that we're in, which is a very, very fortunate one, we have more than adequate capital to fund our business***, and this is the right step to take.

> .   .   .

> So that's all. And Chris here as well, to answer any questions on the financial side. And of course, I'm here to answer questions, but our dividend is, we're going to pay $3 in this first dividend. The goal is basically to pay a dividend twice a year. So we think the right period to kind of measure this is the first half of the year and the second half of the year. The dividend is -- the record date to be a recipient of the dividend is January 4th. The payment date is January 13th. So for those shareholders that are actually owners on the 4th and they'll receive it on the 13th. Our goal then would be roughly in the second half of the year. So the figure after the first half is done, so July or early August, will actually have a similar conversation to this. And our goal is to obviously be consistent with this. ***We feel very good about our forecast for next year. We feel like the environment is a good one, and we're well underway. Obviously, what this does reflect is a significant amount of confidence in both the market for our products as well as the timing for the supply that we're bringing online. So there's no real update to that. We had an earnings call here and the Investor Day and kind of demonstrated that the bottom line is kind of on time and on budget is what our expectations are. And there's nothing we see that actually gets in between now and then.***

> Obviously, March, April, May are not very far away. We sit here in the middle of December. So there's a lot of work to be done, but we feel obviously good about it

and the confidence in our ability to deliver on that is in part reflected on this, but it's not irrational exuberance by any means, it's something that reflects kind of the day-to-day activities of our business.

.   .   .

[Craig Kenneth Shere Tuohy Brothers Investment Research, Inc. – Director of Research]: So first, I want to make sure I understand this correctly. First part, getting the obvious [ streets ] a little below guidance. And the second point that at a 40% payout ratio, the announced dividend run rate implies beating guidance. Am I saying that wrong?

[Edens]: I'm not -- I'm sorry, Craig, I couldn't hear kind of clearly. ***I think that the 40% payout rate with $3, annualized $6 does give you guidance with respect to what we think the EBITDA is for sure. And obviously, we think it's going to be substantially greater next year than it is this year. And that's -- and we have actually tremendous visibility into that. So that's obviously what is driving it.*** And trying to -- I feel like effective dividend policy is one or not -- there's not only a dividend declared, but there's also a paradigm that's used to actually show how it is constructed. So people can then base their expectations on both current and future dividends based on what the actual performance of the business is. ***And so we obviously feel very confident about the performance of the business next year, and we're making a dividend announcement as a reflection of that***. And we think that that's the right path to take.

[Craig Kenneth Shere Tuohy Brothers Investment Research, Inc. – Director of Research]: Sure. I guess just to clarify, when you say $2.5-plus billion next year, EBITDA, this dividend suggests an emphasis on the plus.

[Edens]: I missed just the very last part. The $2.5 billion EBITDA. Sorry, I just missed the last sentence. I couldn't actually understand clearly.

[Craig Kenneth Shere Tuohy Brothers Investment Research, Inc. – Director of Research]: I apologize this. I'm just saying that the dividend announcement would suggest the plus and the $2.5-plus billion is being emphasized as we expect to be able to exceed that number.

[Edens]: That's correct. No, your math is right. So...

.   .   .

[Gregg William Brody BofA Securities, Research Division – Managing Director]: Just as your -- it appears that this is a forward-looking number, which you've -- how do you -- how are you thinking about -- how should we think about how much of that is locked in? And how much margin of safety you've built into that forecast or that forecasted dividend that you're going to pay out?

[Edens]: Yes, there's -- it's -- from my standpoint, it is not really forward-looking based on kind of the business flows and the transactions that we have in hand. So ***we feel like it is reflecting the reality of the business more so than projecting kind of some forward results.*** And we've been very clear about what we think the future holds. We have, obviously, a lot of tools at our disposal to make these numbers. And feel really good about it. I think that we do mitigate a substantial amount of our risk through a variety of different measures. There's the easiest way to lock in provinces to sell supply. We've done a lot of that. The second easiest way to do it is to hedge it. And obviously, there's a lot of factors you can take into consideration there, but we've done that as well. So there's variability. I'd say the most significant variability from my standpoint is in the second half of the year, not the first half of the year, and that just simply relates to when the FLNG turns on. And I think that for those of you that went down to our site visit in Corpus, I think that everyone is there hopefully understands it's merely a question of when, not if. And obviously, a month or 2 or 3 can make a difference.

We believe strongly in the timelines that we have communicated with people. ***So we're going to have mechanical completion in the spring. We're going to get this thing off of the dock and into the water in April, May and turned on in June. I mean that's what the plan is, and we feel great about that plan.*** And so -- but I think that when you look at the -- from our standpoint, when we look at the numbers, there's more variability in the second half of the year than the first half of the year as a result of that. But even with that, there's a very substantial amount of earnings and cash flows that are generated in the ordinary course of the business. So it's not -- that's why I say this -- we don't feel like this is a speculative position we're taking at all. So ***it really just reflects the business.***

(Emphasis added).

139.    The emphasized statements above were materially false and/or misleading. The "$2.5 billion plus" EBITDA figure that Edens presented to investors, and characterized as not being "forward-looking", was not, as he claimed, based on the business "in-hand" or the actual progress of the Altamira FLNG Project. Furthermore, at that time, New Fortress did not expect, and had no reasonable basis to expect, "mechanical completion in the spring [of 2023]" or that the Altamira FLNG Project would be "off the dock and into the water in April, May and turned on in June [2023]." Moreover, the statements omitted the following known, material non-public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) commissioning could not meaningfully or

properly proceed, as the construction of major systems had not yet been completed; (2) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (3) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (4) as described by a former employee, New Fortress created the false impression that project progress was more advanced than it actually was by, among other tactics, presenting key components, such as the FLNG unit's turbines, as completed when, in reality, they were still unfinished; (5) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (6) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

140.    Edens' statements regarding New Fortress' ability to support a $6 per share annualized dividend ($3 semi-annual) were also highly misleading given the actual status of the Altamira FLNG Project. In light of the ongoing construction delays and unresolved commissioning issues detailed above, Edens lacked a reasonable basis to assert that the Company had sufficient free cash flow to support the upcoming $3 semi-annual dividend payment, let alone sustain such substantial dividend payments on an ongoing basis. Nevertheless, Edens repeatedly and emphatically asserted that New Fortress was fully capable of funding the dividend based on its existing business operations, despite having no reasonable basis for such claims in light of the project's actual condition. The fact that New Fortress never issued another dividend of that

magnitude strongly suggests that neither the Company nor Edens genuinely believed the statements regarding its ability to fund such payments were accurate at the time they were made. Worse still, Edens actively encouraged investors, analysts, and credit agencies to rely on his statements by emphasizing his "tremendous visibility" into New Fortress' operations, particularly with respect to the Altamira FLNG Project, thereby reinforcing the credibility of his assertions despite the underlying inaccuracies.

***FEBRUARY 28, 2023***

141.    On February 28, 2023, New Fortress announced its financial results for the fourth quarter and full year of 2022 (4Q22). In connection with the release, the Company issued a press statement and conducted an investor conference call. The  press release, titled *New Fortress Energy Announces Fourth Quarter and Full Year 2022 Results*, stated, in relevant part, as follows:

> NEW YORK--(BUSINESS WIRE)--Feb. 28, 2023-- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the fourth quarter and for the year ended December 31, 2022.
>
> We achieved our Illustrative Adjusted EBITDA Goal of ~$1.1 billion for full year 2022
>
> ***Today we are announcing a 2023 Illustrative Adjusted EBITDA Goal of~$2.0 billion***
>
> Our 2023 Illustrative Adjusted EBITDA Goal, if achieved, would result in a near-doubling of Adjusted EBITDA and Adjusted Net Income in 2023 relative to 2022
>
> .   .   .
>
> ***Construction of our FLNG units is progressing rapidly with the first FLNG unit expected to achieve Mechanical Completion in the Spring of 2023 and commence Operations by mid-2023.***

(Emphasis added).

142.    The emphasized statements above were materially false and/or misleading when made. At that time, New Fortress did not expect, and had no reasonable basis to expect,

"Mechanical Completion in the Spring of 2023" or that the Altamira FLNG Project would "commence Operations by mid-2023." Furthermore, the statements omitted the following known, material non-public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) as described by a former employee, New Fortress misrepresented the actual progress of the Altamira FLNG Project at the Corpus Christi construction site, presenting a more advanced state of completion than what was occurring in reality; (4) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (5) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety, but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

143.    In addition, although New Fortress lowered its EBITDA target from $2.5 billion-plus to $2 billion, the press release nonetheless conveyed the materially misleading impression that the revised $2 billion earnings target remained realistic and achievable, despite internal information indicating otherwise. By that time, construction at the Altamira FLNG Project had already experienced significant delays and was marked by a disorganized and chaotic work schedule. Moreover, the FLNG unit remained incomplete, with critical systems still missing,

uninstalled, or malfunctioning. This gave rise to a significant, yet undisclosed, material risk that the Altamira FLNG Project would not be completed by "Spring of 2023" and that operations would not begin by "mid-2023", effectively eliminating any realistic possibility of achieving, or even approaching, the revised 2023 earnings targets.

144.    Edens and Guinta participated in the investor conference call held on February 28, 2023. During the call, Edens stated, in relevant part, as follows:

> Liquefiers, we talked about a lot. We hosted an Investor Day down at the end of last year. ***The first one is basically near completion***. Chris will give us an update on that. But the first one is the most important. It's basically the way to fully integrate our business, it's the way to kind of get proof of concept of accessing gas and an offshore capacity. So lots more to talk about with that. But we've made significant progress. ***And this year, we've kind of shifted our focus from the mechanical completion of the unit, which is closed, to now the deployment of it, the transfer of it and, of course, the operations of it.***
>
> .   .   .
>
> .   .   . ***Liquefiers, I said we're closing on mechanical completion. Transport, installation, operations now become the things that we're very focused on. The time line is short***. So we're in -- we've gone from triple-digit days to double-digit days. And so we have, as Chris has talked about before, we have a daily call on this. And our teams are working very, very hard on this.

(Emphasis added).

145.    The emphasized statements above were materially false and/or misleading when made. The Altamira FLNG Project was not then "basically near completion." Furthermore, the FLNG unit's liquefiers were not "closing on mechanical completion." At that time, New Fortress employees and contractors were still actively working to complete substantial outstanding construction tasks and had not, as claimed, "shifted [their] focus" to "deployment." Moreover, the remaining "timeline" for mechanical completion, installation, commissioning, and other essential tasks required before commencing "operations" was not, at that time, "short," contrary to what was publicly suggested. And, the statements omitted the following known, material non-

public information, which was necessary to ensure the statements were not misleading in light of the circumstances under which they were made: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) as described by a former employee, New Fortress misrepresented the actual progress of the Altamira FLNG Project at the Corpus Christi construction site, presenting a more advanced state of completion than what was occurring in reality; (4) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (5) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety, but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

146.    Guinta expanded on Edens' remarks during the investor call, stating to investors, in relevant part:

> Turning to Slide #16. And frankly, the headline here says it all. We're less than 100 days away from our first FLNG setting sail to its home in Altamira, Mexico. **With construction nearing completion, we're focused on installation, commissioning and operational readiness**. Regarding our installation, the pipe lay barge is on location today and loading pipe. Late this week, it will begin the short pipe lay work to connect the [indiscernible] pipeline and our FLNG location, and that's expected to take around 3 weeks. We will then perform the hot tap and connect subsea pipe to our risers, which will ensure that all subsea activity will be completed prior to he FLNG arriving in the field.
>
> **For commissioning, we've hired a commissioning team to work in partnership with representatives from our original equipment manufacturers to commission as much of the asset in the yard as possible. The construction site provides access to natural gas, power and utilities, which enable us to test major components such**

*as gas turbines at the Kiewit yard. Also, we can do shore-based testing and validation of controlled safety systems, instrumentation and process optimization, all while the assets are getting final touches completed. The onshore commissioning capabilities reduces a typical offshore commissioning time line by around 6 weeks.*

Finally, regarding operations, we've hired our installation, training and offshore management teams, including our Board operators and maintenance technicians. And these folks are working through our critical operating procedures as well as training simulators now and are being used to complete competency training. We've established our shore base at the Port of Altamira for storage needs, commission activities and ongoing operations.

So what does all this mean? Turn to Slide #16, and let me update you on the time line from today through COD. *The current estimate for mechanical completion of our first rig is May 2023*. This includes a staggered readiness of the 3 rigs and the final is *expected to be completed in early June.* As mentioned on the previous slide, we have the ability to commission systems on a rig-by-rig basis, and we've sequenced the rigs to maximize readiness ahead of the offshore hookup. We're starting in the field construction activities this week, including the pipe lay and other makeready activities to receive the [ FOCs ]. Rigs will be towed from the Yard to Altamira as they are completed and full offshore hookup is expected to be completed in June. This includes the station of the rigs on location and also the installation of the Penguin FSRU. *First gas is expected to the units in late June, and our first LNG production will be July 2023 and expect to hit COD in August of 2023.*

(Emphasis added).

147.    The emphasized statements above were materially false and/or misleading when made. Construction of Altamira FLNG Project was not "nearing completion." Furthermore, New Fortress did not, at that time, expect, nor did it have any reasonable basis to expect, "mechanical completion of our first rig [in] May 2023," final rig completion in early June 2023, "first LNG production" in July 2023, or the full commencement of commercial operations in August 2023. Moreover, the emphasized statements above were materially false and/or misleading when made because: (1) commissioning could not meaningfully or properly proceed, as the construction of major systems had not yet been completed; (2) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly

sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (3) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (4) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (5) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety, but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

148.    During the question-and-answer portion of the call, Edens continued to misrepresent the actual status of the Altamira FLNG Project while assuring analysts of New Fortress' ability to generate "high quality, repeatable, predictable earnings." In response to an analyst's question, Edens stated, in relevant part, as follows:

> [Cameron James Lochridge BofA Securities, Research Division – Research Analyst]: That's great. I much appreciate it. If I could just quick follow-up on that. Wes, you mentioned a very measured approach to deploying new supply via FLNG. I just -- I want to dig in there a little bit. Is that to imply that before you bring on additional FLNG volumes, you'll want to have contracted offtake agreements in hand? Or in other words, are we not to expect these FLNG volumes to be purely merchant volumes but rather have dedicated offtake agreements prior to them coming online?
>
> [Edens]: Yes, it's the latter. It's really a -- there's not a hard and fast rule about it, but we want to have clean line of sight to half of the volume is being deployed before we actually turn the unit on. That said, these units take a while to build. ***We are nearly done with #1***, and we have #2 and 3 well under development. So we've got stuff that is on the back burner, basically moving ahead. The volumes at this point would be 2024 volume, so still volumes that would be in a market which prospectively could be quite a tight one. And so the merchant volumes could be very valuable to us at that point in time. But we don't want to interject a lot of market volatility into the earnings. ***We're on a path to high quality, repeatable, predictable earnings.***

(Emphasis added).

149.    Edens' emphasized statement was false and/or materially misleading because the FLNG unit for the Altamira FLNG Project was not "nearly done." In reality, the unit was far from complete and even further from being ready for commissioning or operational use. As detailed above, construction was still actively underway, with key components either missing or malfunctioning, according to multiple former employees. As a result, Edens had no reasonable basis to assure analysts and investors that the Altamira FLNG Project would be capable of generating "high quality, repeatable, predictable earnings" in the near term, if at all. Guinta also took part in the question-and-answer segment of the call. When asked by an analyst about the foundation for New Fortress' $2 billion EBITDA target, Guinta responded by assuring that the Company's projections carried "very little volatility" and "very little at risk." In relevant part, Guinta stated as follows:

> [Gregory Robert Lewis BTIG, LLC, Research Division – MD & Energy and Infrastructure Analyst]: I was hoping to talk a little bit about the updated EBITDA guidance and kind of maybe some of the puts and some of the takes. You mentioned the volumes. Kind of curious if you've adjusted your spread assumptions around the EBITDA guidance. And then as we think about that $2 billion number, just looking at consensus, it is still a little bit above where the street is. So really just kind of trying to understand how we should be thinking about it and maybe where some of that delta might be.

> [Guinta]: Yes. Greg, so to answer the question, I mean, we had $2.5 billion we talked about at the last earnings call. $2 billion now of that -- the difference is really just FLNG timing and the downstream execution, as Wes has talked about on this call. *We feel really good about it, too*. It is above where a lot of the estimates are today. *There's very little volatility in that $2 billion. We feel really comfortable about that.* Certainly, the $2.5 billion included a little bit more volumes under the FLNG scenario and it had a little bit of a higher strip. But as Andrew has said, we've termed out more and more of that gas since we announced the call in November of 2022. *So very little at risk, and we feel great about the $2 billion for 2023 calendar year.*

(Emphasis added).

150.    The emphasized statements above were materially false and/or misleading when made. In reality, the EBITDA figures presented by management carried significant "risk" and

"volatility," contrary to Guinta's assurances. Furthermore, in stating that the EBITDA figure had been revised downward from $2.5 billion to $2 billion due to "FLNG timing and the downstream execution," Guinta omitted the following known, material non-public information contributing to further delays and EBITDA reduction, information that was necessary to disclose in order to ensure his statements were not misleading under the circumstances in which they were made: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (4) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety, but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

151. Additionally, although Guinta acknowledged that the reduction in guidance was due to "FLNG timing," he nonetheless projected near certainty regarding the revised $2 billion EBITDA target. He repeatedly expressed confidence in achieving the target, asserting that it carried "very little volatility" and posed "very little risk." In truth, however, the timeline for the FLNG unit was highly uncertain and fraught with substantial risk. Construction had already experienced significant delays and continued to lag, with key systems either uninstalled or malfunctioning, as described above.

152. Edens further asserted that New Fortress was "days away" from achieving "proof

of concept" for the FLNG unit. In relevant part, he stated:

> Number two, I think the question about the businesses are really good at this, right? So it's something that we feel like we've demonstrated a pretty good capacity to do things. We're not perfect. We're learning every day. We've got a great group of people. But I think that we now have a very, very good proof of concept at every level that -- *except for the FLNG, which you are now days away from having proof of concept with*. So we feel like that's pretty good.

(Emphasis added).

153.    Edens' statements emphasized above were materially false and/or misleading at the time they were made because New Fortress was not "days away" from achieving "proof of concept" with the FLNG unit—that is, demonstrating the unit's ability to produce LNG or First Gas. In reality, critical components and systems remained uninstalled, incomplete, or in need of repair, as detailed above. These deficiencies made any claim of imminent operational readiness unfounded.

*May 4, 2023*

154.    On May 4, 2023, New Fortress released its financial results for the first quarter of 2023 (1Q23). In conjunction with the announcement, the Company issued a press release and conducted an investor conference call. The press release, titled *New Fortress Energy Announces First Quarter 2023 Results*, stated, in relevant part:

> NEW YORK--(BUSINESS WIRE)--May 4, 2023-- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the first quarter of 2023.
>
> .   .   .
>
> **On track to achieve our Illustrative Adjusted EBITDA Goal of ~$2.0 billion for 2023**
>
> .   .   .
>
> **Construction of our first Fast LNG unit is 90%+ Complete and Deployment to Altamira is expected in June 2023**

> ***We expect to complete Commissioning of our first Fast LNG unit in the shipyard and on-location at the Altamira site and continue to anticipate First Gas and COD in July 2023 and August 2023, respectively.***

(Emphasis added).

155.    The emphasized statements above were materially false and/or misleading when made. At that time, construction of the LNG unit was not "90+% complete," contrary to the statement made in the press release. Furthermore, New Fortress did not, at that time, expect, nor did it have any reasonable basis to expect, "First Gas and COD in July 2023 and August 2023, respectively."; Moreover, the emphasized statements above were materially false and/or misleading when made because: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (2) even for the LNG unit itself, substantial work remained before the Company could reasonably assess its proximity to construction completion, including the critical nitrogen run test, which had yet to be conducted; (3) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (4) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (5) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (6) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only

endangered worker safety, but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

156.    Additionally, the press release reinforced the materially misleading impression that the $2 billion earnings target was achievable when, in reality, it was not. Construction was far from complete and would not be finalized while the FLNG unit remained onshore, making it impossible to complete commissioning prior to offshore deployment. Thus, beyond misrepresenting the FLNG unit's actual state of completion, the above statements also concealed a significant and undisclosed material risk—that the Altamira FLNG Project would not be completed on time. This undisclosed risk effectively eliminated any realistic prospect of achieving, or even approaching, the 2023 earnings targets.

157.    Edens and Guinta participated in the May 4, 2023 investor conference call. During the call, Guinta stated, in relevant part:

> Turning to Slide #13. ***Our first Fast LNG project is nearing completion. At this point, we're executing the final phases of our construction program while we prepare for offshore operations.*** The modules have been completed, lifted and set on the rigs and are currently undergoing integration and testing. The pipelay and mooring anchor installation is complete and awaiting rigs to arrive on site.
>
> Our team is expecting to have the rigs sail from Ingleside over the next 30 to 60 days and gas to be introduced into the system in the month of July. Finally, our expectation is that we will announce COD in August. ***Our full commissioning team is on location in Ingleside now and working to complete as much commissioning in the yard as possible in order to shorten the time between first gas and COD.***

(Emphasis added).

158.    The emphasized statements above were materially false and/or misleading when made. First, the "construction program" for the Altamira FLNG Project was not, at that time, in "the final phases," contrary to Guinta's representation during the call. Furthermore, the emphasized were materially false and/or misleading when made because: (1) commissioning could not meaningfully or properly proceed, as the construction of major systems had not yet been

completed; (2) even with respect to the LNG unit itself, substantial work remained before the Company could reasonably assess its proximity to construction completion—including the completion of a critical nitrogen run test; (3) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary; (4) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (5) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (6) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

***August 8, 2023***

159.    On August 8, 2023, New Fortress released its financial results for the second quarter of 2023 (2Q23). In connection with the announcement, the Company issued a press release and held an investor conference call. The press release, titled *New Fortress Energy Announces Second Quarter 2023 Results*, stated, in relevant part:

> NEW YORK--(BUSINESS WIRE)--Aug. 8, 2023-- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the second quarter of 2023.
>
> .   .   .
>
> **Illustrative Adjusted EBITDA Guidance for 2023 revised to $1.6 billion to reflect lower expected cargo earnings and timing of infrastructure projects coming online, while 2024 guidance reiterated at $2.4 billion**
>
> .   .   .

**Fast LNG**
> •**Mechanically completed each of our modules and three rigs on FLNG1, with our Pioneer III rig successfully installed offshore in August**
> •**Expecting to complete and install the remaining two FLNG rigs in August and introduce First Gas and achieve COD in September**

(Emphasis added).

160.    The emphasized statements above were materially false and/or misleading when made. Construction of each module and the three rigs comprising the Altamira FLNG Project was not, at that time, "mechanically completed," contrary to the representations made in the press release. Furthermore, New Fortress did not, at that time, expect—and had no reasonable basis to expect, that installation would be completed in August 2023, or that it would be able to "introduce First Gas and achieve COD" in September 2023. Moreover, the statements were materially false and/or misleading when made because: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; and (4) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project.

161.    Additionally, given the actual status of the FLNG unit's completion, the above statements created a misleading impression and concealed a significant and material risk that the

Altamira FLNG Project would not be completed on schedule. This undisclosed risk materially undermined the credibility of New Fortress' earnings targets for both 2023 and 2024.

162.    On August 8, 2023, Edens and Guinta participated in an investor conference call to discuss the Company's financial results for the second quarter of 2023. During the call, they made the following materially false and misleading statements:

[Edens}: . . . Compared to the first half of last year, we're up significantly. So $541million last year in the first half, $686 million. And this year, perhaps more importantly, ***the guidance that we see now for the rest of the year, $1.6 billion for 2023 and $2.4 billion in 2024. A little bit of reduction of guidance for this year, just as a function of a few of the projects delivering late but still very, very solid earnings for the rest of the year and our future is incredibly bright.***

.  .  .

So Page #5. These are a list of the projects. So there's FLNG 1, which Chris Guinta will talk about, the liquefier, which is in the process of being deployed as we speak***. It's materially complete.***

.  .  .

[Guinta]: Great. Thanks, Wes. Good morning, everybody. Please turn to Slide #8, and we provide some added details on the completion of Fast LNG number 1. So as mentioned, thanks to the incredible effort by our team in Corpus Christi and in Mexico. We continue to make major progress, and we're nearing our goal of COD by the end of this quarter.

At this point, ***each of the rigs have achieved mechanical completion***, and we're in the process of commissioning various systems while the remaining rigs are still in the Kiewit shipyard. As a reminder, FLNG is comprised of 3 specific rigs with the names Pioneer 1, 2 and 3. Pioneer 1 is the gas processing module. This is connected to the subsea riser and it dehydrates and prepares the gas for liquefaction. This unit is expected to mobilize and be installed around August 23. And Pioneer 2 is the liquefaction module that includes the chart, cold box and Baker Hughes compressor, which together changed the vapor into LNG. This unit is expected to mobilize and be installed around August 28. Pioneer 3 has the accommodations, power and electrical control hub, and this is the unit that has already been mobilized and installed offshore.

From a marine construction standpoint, all activities have been completed, including the installation of the hot tap assembly on the [ sur de pass ] pipeline, a 3-kilometer pipeline lateral to our FLNG asset and the anchor mooring

installation for our storage vessel. In addition, our floating storage vessel, the Penguin has completed all of its make-ready activities and currently in transit to Altamira where it will clear in and hook up to its installed moorings later this month. The next step is to sail units P1 and P2 over the next couple of weeks to their location offshore, and then ***we expect to introduce first gas in September and sell our first cargo in October of 2023.***

(Emphasis added).

163.    The emphasized statements above were materially false and/or misleading when made. Construction of the Altamira FLNG Project was not, at that time, "materially complete," contrary to Guinta's representation during the investor conference call. Furthermore, New Fortress did not, at that time, expect, and had no reasonable basis to expect, that installation would be completed in August 2023, or that it would be able to "introduce first gas in September and sell our first cargo in October of 2023." Moreover, the statements were materially false and/or misleading when made because: (1) construction was not progressing efficiently; instead, it was undermined by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays resulting from the failure to procure necessary components; (2) as confirmed by former employees, the timelines issued for the Altamira FLNG Project lacked any reasonable basis and were internally recognized as unrealistic; (3) the decision to utilize repurposed, used jack-up rigs subjected the Company to additional construction delays, as the operability of key components had not been verified and many parts required replacement; (4) by neglecting standard safety measures and pressuring employees to rush construction at all costs, the Company created an environment that not only endangered worker safety but also increased the risk of equipment failures, leading to further delays in the Altamira FLNG Project; and (5) New Fortress did not, at that time, expect, and had no reasonable basis to expect, that installation would be completed in August 2023, or that it would be able to "introduce first gas in September and sell our first cargo in October of 2023."

164.    Additionally, the Altamira FLNG Project was not "materially complete" and had not achieved "mechanical completion." In reality, construction was still underway, with critical systems either not yet installed or malfunctioning. Furthermore, the project was operating without engineering support from Fluor Corporation, according to former employees. The true status of the FLNG unit's completion effectively nullified any realistic prospect of New Fortress meeting its projected commissioning and production timelines for September and October 2023, respectively. As a result, the Company's earnings targets for the year were likewise unattainable.

***NOVEMBER 8, 2023***

165.    On November 8, 2023, New Fortress announced its financial results for the third quarter of 2023 (3Q23). In conjunction with the release, the Company issued a press release and held an investor conference call. The press release, titled *New Fortress Energy Announces Third Quarter 2023 Results*, stated, in relevant part:

    .   .   .

> ***Completed sailaway, installation, and First Gas for our first FLNG asset in offshore Altamira, Mexico; First LNG and COD expected by the end of the fourth quarter 2023***

(Emphasis added).

166.    The emphasized statement above was materially false and/or misleading when made. New Fortress had not "completed sailaway, installation, and First Gas," as publicly claimed, because construction and commissioning activities remained unfinished. Critical systems were either not yet installed or were malfunctioning, and system integration work for the liquefaction plant was still incomplete Furthermore, New Fortress did not, at that time, expect—and had no reasonable basis to expect, that it would commence commercial operations "by the end of the fourth quarter 2023." Moreover, the statements were materially false and/or misleading when

made because: (1) as confirmed by former employees, the Lloyd's insurance syndicate providing coverage for the Altamira FLNG Project had formally placed New Fortress on notice regarding non-functional critical systems and had threatened to withdraw insurance coverage if the deficiencies were not promptly addressed; (2) the true status of the FLNG unit's completion eliminated any realistic possibility that New Fortress could meet the production timelines outlined in the press release, and as a result, this also critically undermined any reasonable prospect of achieving the Company's stated earnings targets; and (3) New Fortress further jeopardized its publicly stated deadlines by terminating its engineering, procurement, and construction (EPC) contractor, Fluor Corporation, in mid-2023, a decision that removed essential technical expertise at a critical stage of the project.

167.    Edens and Guinta participated in the investor conference call held on November 8, 2023. During the call, they made the following statements, in relevant part:

> [Edens]: . . . Actually, by far, the best operational quarter that we had hit in the history of the company. Many, many highlights to talk about in terms of what we've done on the operating side, but a few things to point out. Number one, first and foremost, in our view and many others out there. ***Our first FLNG unit is now firmly in place. It's been mechanically completed. It's in the field. It is connected to the pipeline. It's in the final stages of being commissioned***, really a remarkable accomplishment by the entire team, 5.4 million man hours, 2.5 years. So a record of a liquefier in the world by every single measure and something we're quite proud of. And obviously, a real cornerstone of the supply side of our business.
>
> .   .   .
>
> Look at Page 4 briefly, so the quarterly financial results. The 3 pillars kind of our earnings are quality, duration and growth. The -- as I said before, 100% of our earnings are coming from downstream customers, $208 million of adjusted EBITDA for the quarter. We are now in the last stage of the year. ***Our expectation is still the same, $1.6 billion in adjusted EBITDA for this year, $2.4 billion for next year***, $1.6 billion, about $200 million of that we expect to come from gains on asset sales in the fourth quarter.
>
> So ***there could be some volatility there in terms of just the timing of those, but those are pretty straightforward. Notably, of the $2.4 billion that we are***

*forecasting for next year, virtually all of it is already contracted. Of our $2.4 billion estimate for next year, all of it about $250 million is already contracted.* So quality of cash flow is coming 100% from downstream customers, duration of our portfolio in excess of 12 years. And the growth, we currently only use about 25% of the capacity of our terminals. So there's a massive potential for organic growth going forward.

.   .   .

[Guinta]: Yes. Thanks, Wes. Good morning, everybody. The progress in FLNG 1 is nothing sort of remarkable. We started the process of FLNG from a standing start on March 9, 2021. And in 31 months, we're proud to announce that we have gas into the system and expect to conclude commissioning by the end of the year. While a typical LNG project takes on average 5 to 7 years, but thanks to our incredible employees, contractors, equipment providers and regulators were ***nearing the completion of 1 of the world's most advanced offshore LNG facilities.***

So quickly, just a brief recap of what has occurred and an outline of what happens from here. Over the last 60 days, the remaining 2 rigs have moved from their construction site in Corpus Christi to their permanent home in Altamira. All 3 rigs have been jacked up into position, connected to 1 another and hooked up to the subsea pipeline.

On Monday, we opened the valve of the subsea pipeline and moved the first gas molecules into our system. The nat gas then flows from the hot tap assembly through the riser to our rig and into our high-pressure let-down valve. From now through COD, the process will be to move gas into the turbines and complete commissioning of the power generation system and then move natural gas into our pretreatment module. Gas flows through the mixed refrigerant compressor and into the cold box, where LNG will then be produced.

Once LNG is produced, the LNG then flows into our floating storage unit, the NFE Penguin, which will arrive on site in about 10 days***. Our team has done a phenomenal job completing the various construction work streams, methodically and safely commissioning critical equipment, and we expect to see the first drop of LNG in the next few weeks.***

(Emphasis added).

168.    Edens' and Guinta's emphasized statements above were materially false and/or misleading when made. The FLNG unit was not "firmly in place" or "mechanically completed," rather, construction and commissioning activities were still ongoing, with key systems unfinished or not yet operational. Furthermore, the team had not "done a phenomenal job completing the

various construction work streams" or "methodically and safely commissioning critical equipment." In reality, critical sequencing steps and safety protocols, such as the nitrogen run test, had been skipped, undermining the integrity of the commissioning process. Moreover, the emphasized statements above were materially false and/or misleading when made because: (1) as confirmed by former employees, the Lloyd's insurance syndicate providing coverage for the Altamira FLNG Project had formally placed New Fortress on notice regarding non-functional critical systems and had threatened to withdraw insurance coverage if the deficiencies were not promptly addressed; (2) the true status of the FLNG unit's completion eliminated any realistic possibility that New Fortress could meet the production timelines outlined in the press release, and as a result, this also critically undermined any reasonable prospect of achieving the Company's stated earnings targets; and (3) New Fortress further jeopardized its publicly promoted deadlines by terminating its engineering, procurement, and construction (EPC) contractor, Fluor Corporation, in mid-2023, removing key technical resources at a critical phase of the project and exacerbating existing delays.

### FEBRUARY 29, 2024

169.    On February 29, 2024, New Fortress announced its financial results for the fourth quarter and full year of 2023 (4Q23). In connection with the announcement, the Company issued a press release and held an investor conference call. The press release, titled *New Fortress Energy Announces Record Fourth Quarter and Full Year 2023 Results*, stated, in relevant part:

> NEW YORK--(BUSINESS WIRE)--Feb. 29, 2024-- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the fourth quarter and for the year ended December 31, 2023.
>
> Summary Highlights
>
> > Adjusted EBITDA of $388 million in the fourth quarter of 2023 and $1.3 billion in the full year 2023

.   .   .

In Fast LNG, *we successfully placed our first unit into its location and are now expecting first LNG in March and First Cargo in April 2024*.

.   .   .

In 2023, we generated significant increases in Funds from Operations per share, more than doubling compared to the full year 2022. *Our Illustrative Goal is to nearly double these metrics again in the full year 2024.*

(Emphasis added).

170.    The emphasized statements above were materially false and/or misleading when made. Construction and commissioning were not complete, both of which are processes that typically occur well before installation. Specifically, piping and system integration work for the liquefaction plant remained unfinished. Moreover, as of February 2024, critical components, such as the mixed refrigerant compressor, which is essential to the liquefaction of natural gas, had not yet been commissioned. Numerous other systems, including the firewater system, hot oil system, LNG boil-off gas compressor, and the rig's primary power sources, were also not operational. These deficiencies, as confirmed by former employees, further illustrate the extent of ongoing issues. As confirmed by a former employee, "hundreds" of "Priority A" tasks, those essential for safe and functional commissioning, remained incomplete as of February 2024.  As also confirmed by former employees, the Lloyd's insurance syndicate providing coverage for the Altamira FLNG Project had formally placed New Fortress on notice regarding non-functional critical systems and had threatened to withdraw insurance coverage if the deficiencies were not promptly addressed. The true status of the FLNG unit's completion eliminated any realistic possibility that New Fortress could meet the production timelines outlined in the press release, and as a result, this also critically undermined any reasonable prospect of achieving the Company's stated earnings targets. Lastly, New Fortress further jeopardized its publicly promoted deadlines by terminating its

engineering, procurement, and construction (EPC) contractor, Fluor Corporation, in mid-2023, removing key technical resources at a critical phase of the project and exacerbating existing delays.

171.    Edens and Guinta participated in the investor conference call held on February 29, 2024 and made the following statements, in relevant part:

> [Edens]: . . . So Page 3. 2023 was a very good year. Fourth quarter, a record quarter 4 as well from an operating perspective, $1.3 billion in EBITDA, $388 million in EBITDA for the quarter, that more than doubled earnings per share and FFO for 2022 to 2023, and **we're poised to roughly double that again this year.** So tremendous financial results. Most importantly, when you look at the second line down, it's not a number, but it's the second line, the profit from cargo sales, you'll see 0 contribution essentially from cargo sales in Q3 and Q4, which now fully reflects that our business is operating on the -- through the terminals to our customers and our sales of gas and products in power. And so very much an operating company now from -- as opposed to a development company. And both the quantity and the quality of those earnings were terrific.
>
> .   .   .
>
> Our Fast LNG lastly, there's a lot of news around that. So in short term, **we installed the first of our facilities. We expect first LNG in the month of March and the first cargo in the month of April. So obviously, we're at the very, very tail end of that project.** And while it's been a little bit delayed, it's important to note that it still would be the fastest LNG installation in the history of the planet. So we are always aggressive in terms of our objectives. But even with the [ beats ] slipping a little bit on balance, we feel very, very good about what we have done.
>
> .   .   .
>
> [Guinta]: Thanks, Andrew. Good morning, everybody. Let's flip to Slide 22 and talk through our FLNG projects. Over the last 3 years, we've assembled an amazing team of employees, contractors and construction partners that have been working around the clock to make our first FLNG unit a reality.
>
> The headline is that **we're in the final stages of commissioning and expect first LNG in late March and our first cargo to sale in April**, on which I'll go into more detail shortly. But before I do, I want to share just a brief background of how we got to this point. As most of you listening are well aware, the LNG production market is dominated by super majors and national oil companies or by project-focused entities that require 20-year offtake agreements with investment-grade counterparties. At NFE, however, we have stood in the gap and built critical energy infrastructure in emerging markets that need access to LNG now. So in late 2020 and early 2021, we were seeking to add to our LNG supply portfolio and found it difficult to get the quantity and the duration that we required for 2 primary reasons.

First, a lack of overall supply in the market for the midterm period, notably 2024 through 2027. Given that all the [ land ] currently operating liquefaction projects were nearly 100% contracted. And second, as we were only a single B rated entity at the time, the credit support and project finance nature of the operating projects did not allow for them to sell substantial quantities to NFE.

So move to Slide 23, and let's talk about what we did as a response. As I've mentioned on this call before, West scheduled a daily call every week day morning for the last 3 years, where we aim to complete a solution that would be quick to market and allow us to serve the growing needs of our downstream customers. First, we sought to eliminate design slack that would require significant engineering contingencies and immediately went to work building the modules for gas treatment, liquefaction and power.

We executed on long lead procurement in order to focus on speed to market with industry-leading OEMs like Chart, Baker Hughes and Siemens. We purchased jackup rigs to serve as the foundation for the modules, eliminating the long and difficult process of constructing purpose-built marine assets like ships or barges that have been done for other offshore liquefaction solutions. And of course, we chose topflight engineering and construction partners in Fluor, Kiewit, Arendal, Zentech and others to ensure excellent workmanship. So where did that get us?

We'll move to Slide 24, and you can see a recent photo of the FLNG unit on location. With respect to our first FLNG unit, we declared FID in March of 2021, and we will have first LNG in March of 2024, making this the fastest large-scale LNG project ever developed. We've completed over 8 million man-hours of construction to date. We've transported rigs to their location in Altamira, completed the hot tap and introduced feed gas for commissioning. And we have our LNG storage vessel, the NFE Penguin, securely moored and connected to the rigs awaiting LNG loading. ***Finally, the commissioning and operating teams are aggressively working to produce first LNG, which is scheduled for late March, followed by the first cargo sailing in April.***

I'm moving to Slide 25. And ***now that we're nearing the conclusion of commissioning for our first FLNG unit,*** we're turning our attention to FLNG 2, which has a much cheaper and faster deployment time frame given its onshore nature Christine pad site existing infrastructure and knowledge gained from FLNG 1.The modules are under construction now and will be completed in Q3 2025 and will then ship to Mexico for installation at Altamira terminal with expected completion in Q1 2026. The terminal was built by Shell and is in excellent operational condition. There's LNG in the tanks, full deepwater marine berthing capabilities and ample land to receive the modules. Quite frankly, you could not ask for a better location. FLNG 2 uses the exact same technology and design as FNG 1 but a completely different contracting strategy, one that allows us for much more certainty around price and schedule. We have a fixed price date certain

contract for our modules and a fixed price date certain contract with our civil contractor for the onshore installation. We have 90% of the procurement already completed. And in many cases, the equipment is on location in the Kiewit Yard or ready to ship from the original equipment manufacturer. And finally, as Wes mentioned, we're excited to announce that we have secured committed financing for a $700 million loan for FLNG 2. To date, we have invested a little more than $300 million already, and the balance will be funded by the $700 million construction term loan.

(Emphasis added).

172.    Edens' and Guinta's emphasized statements above were materially false and/or misleading when made. New Fortress was not, at that time, "at the very, very tail end of the [Altamira] project," as publicly claimed. Furthermore, New Fortress did not, at that time, expect—nor did it have a reasonable basis to expect—that the Altamira FLNG Project would be fully operational in time for the first commercial LNG cargo to depart just two months later, in April 2024.Moreover, the emphasized statements above were materially false and/or misleading when made because: (1) construction and commissioning were not complete, both of which are processes that typically occur well before installation. Specifically, piping and system integration work for the liquefaction plant remained unfinished. Moreover, as of February 2024, critical components, such as the mixed refrigerant compressor, which is essential to the liquefaction of natural gas, had not yet been commissioned. Numerous other systems, including the firewater system, hot oil system, LNG boil-off gas compressor, and the rig's primary power sources, were also not operational. These deficiencies, as confirmed by former employees, further illustrate the extent of ongoing issues; (2) as confirmed by former employees, the Lloyd's insurance syndicate providing coverage for the Altamira FLNG Project had formally placed New Fortress on notice regarding non-functional critical systems and had threatened to withdraw insurance coverage if the deficiencies were not promptly addressed; (3) the true status of the FLNG unit's completion eliminated any realistic possibility that New Fortress could meet the production timelines outlined

in the press release, and as a result, this also critically undermined any reasonable prospect of achieving the Company's stated earnings targets; (4) New Fortress further jeopardized its publicly promoted deadlines by terminating its engineering, procurement, and construction (EPC) contractor, Fluor Corporation, in mid-2023, removing key technical resources at a critical phase of the project and exacerbating existing delays; (5) as of February 2024, almost no systems had been commissioned, and key components—such as the primary power sources for the rig, remained non-operational, according to former employees. As confirmed by a former employee, "hundreds" of "Priority A" tasks, those essential for safe and functional commissioning, remained incomplete as of February 2024; and (6) the true status of the FLNG unit's completion eliminated any realistic possibility of New Fortress meeting the production timelines presented by Edens and Guinta, and in turn, it also undermined any reasonable prospect that New Fortress could "double" its 2023 earnings by year-end, as publicly suggested.

**MARCH 25, 2024**

173.    On March 25, 2024, New Fortress held a special investor call during which Edens again misrepresented the status of the Altamira FLNG Project. In relevant part, Edens had the following dialogue with a stakeholder:

> [Sherif Ehab Elmaghrabi BTIG, LLC, Research Division – Research Analyst]: How do these transactions affect your gas supply? I think you previously talked about roughly 120 TBtus annually coming from third parties. Just wondering how that delta shakes out and where are we on how FLNG 1 is progressing?
>
> [Edens]: In gas, this is. Gas [indiscernible] right now is actually quite matched, right? So our goal is to not take exposure to gas markets. The supply that we would need in Brazil, which is potentially significant, is all indexed to market. So you have kind of spot exposure versus spot market. So that's great. With respect to Puerto Rico right now, this is what we had anticipated.
>
> So we are, at this point, very matched with ***FLNG 1 coming online here any day***. That's roughly 70 TBtus use of gas, FLNG 2, which we're now actually under construction or will be, there's another 70. So that's 140. So that's the supply that

we see kind of earmarked for Puerto Rico in the short to intermediate term. And obviously, if we are successful and expand our operations there, we would then look to expand our gas supply as well, which is kind of the next phase of it.

(Emphasis added).

174.    Edens' emphasized statement above was materially false and/or misleading when made because the Altamira FLNG Project, or FLNG 1,  was not "coming online . . . any day" at that time. In reality, Edens knew but concealed that: (1) construction and commissioning were still incomplete, both of which are critical phases that typically occur well before installation is finalized. Moreover, as of February 2024, critical components, such as the mixed refrigerant compressor, which is essential to the liquefaction of natural gas, had not yet been commissioned. Numerous other systems, including the firewater system, hot oil system, LNG boil-off gas compressor, and the rig's primary power sources, were also not operational. These deficiencies, as confirmed by former employees, further illustrate the extent of ongoing issues. As confirmed by a former employee, "hundreds" of "Priority A" tasks, those essential for safe and functional commissioning, remained incomplete as of February 2024 and major installation work remained ongoing as of March 2024; (2) as also confirmed by former employees, the Lloyd's insurance syndicate providing coverage for the Altamira FLNG Project had formally placed New Fortress on notice regarding non-functional critical systems and had threatened to withdraw insurance coverage if the deficiencies were not promptly addressed; and (3) as of February 2024, almost no systems had been commissioned, and key components—such as the primary power sources for the rig, remained non-operational, according to former employees.

***MAY 8, 2024***

175.    On May 8, 2024, New Fortress announced its financial results for the first quarter of 2024 (1Q24). In connection with the announcement, the Company issued a press release and

held an investor conference call. The press release, titled *New Fortress Energy Announces First Quarter 2024 Results*, stated, in relevant part, as follows:

> NEW YORK--(BUSINESS WIRE)--May 8, 2024-- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the first quarter of 2024.
>
> Summary Highlights
>
> .   .   .
>
> ***Illustrative Adjusted EBITDA Goal of ~$2 billion in the full year 2024***
>
> "This has been a tremendous quarter for the company with a number of significant milestones. ***We have completed the construction of our first FLNG unit and are currently commissioning the asset, with First LNG expected later this month and first full cargo expected in June.*** We commenced operations in Brazil at both of our LN terminals and have 2.2 gigawatts of power under construction. Additionally, we completed the sale of the power plants that we developed for FEMA in Puerto Rico and concurrently won an 80 Tbtu island-wide gas contract, paving the way for significant expansion of our business in Puerto Rico. These milestones underscore our commitment to growth, sustainability, and long-term shareholder value," said Wes Edens, NFE chairman and chief executive.

(Emphasis added).

176.   The emphasized statements identified above were materially false and/or misleading when made. The Company did not, at that time, expect, and had no reasonable basis to expect, "First LNG" production within the month, nor the shipment of the "first full cargo" in June 2024. Furthermore, the emphasized statements above were materially false and/or misleading when made because: (1) construction was still ongoing following recent and severe setbacks. As detailed by former employees, an explosion occurred on April 26, 2024, aboard the rig, damaging critical LNG refrigeration operations. This incident required extensive repairs and resulted in significant delays to the project timeline; (2) New Fortress had not secured service contracts that reflected its internal understanding that the FLNG unit remained months away from reaching commercial operation, further underscoring the disconnect between public statements

and the project's actual status; and (3) The FLNG unit's actual state of completion eliminated any realistic possibility that New Fortress could meet the production timelines outlined in the press release, and consequently, it also undermined any reasonable prospect of achieving the Company's stated earnings targets. As a result, in addition to falsely representing that the FLNG unit was completed or nearly ready for commercial operation, the statements above also created and concealed significant and material risks. These included the likelihood that the Altamira FLNG Project would not be completed on schedule, and that New Fortress would be unable to meet—or even come reasonably close to meeting, its earnings target for 2024.

177.    Edens and Guinta participated in the investor conference call held on May 8, 2024. During the call, they made the following statements, in relevant part:

> [Edens]: …. Today, ***the liquefier is mechanically complete. We are in the final stages of commissioning it. We expect gas in a matter of the next several days, not months. We expect the first cargo in June***. . . . .
>
> .  .  .
>
> [Guinta]: Thanks, Andrew. Good morning, everybody. Let's flip to Page #19 and talk to the FLNG projects. On this slide, we've included a recent photo of FLNG 1 offshore Altamira, and ***the positive news is we are in the absolute final stages of commissioning. We've fully commissioned all safety systems, power and utilities equipment, the gas treatment modules, LNG pumps and the LNG transfer hoses, and we're working on the final system to be completed, which is the MR compressor.*** I do want to take a moment and confirm that we did experience an incident with a pipe fracture inside of our cold box last Friday, April 26. This is an extremely unfortunate given that we are expecting First LNG a mere 72 hours later.
>
> The pipe incident caused the box's insulation material, a nontoxic volcanic sand called perlite to be admitted [sic] all over the rigs. Thankfully, no significant injuries were sustained and as a result of our excellent team in the field as well as our preventative measures together ensured that no adjacent systems were damaged. While the incident looked like it was much more extensive than it actually was on account of the perlite dusting, ***the damage was isolated to one pipe and manifold within the box and is expected to be repaired by next weekend.*** This is why commissioning is so important and why we've invested in excellent partners that have been overwhelmingly supportive as we try to move through the balance of the commissioning work and produce

LNG.

(Emphasis added).

178.    Edens' and Guinta's emphasized statements above were materially false and/or misleading when made. The Company was not, at that time, in "the final stages" or the "absolute final stages" of commissioning, as claimed; instead, critical commissioning activities were still underway, and substantial work remained before the FLNG unit could be deemed operational. Furthermore, the Company significantly understated both the severity of the explosion that occurred within the cold box and the extent of repairs required to address the resulting damage. Moreover, New Fortress and Guinta did not expect, and had no reasonable basis to expect—that the cold box would be "repaired by next weekend." The operational timeline for the FLNG unit remained uncertain, in part because construction and commissioning activities were still ongoing. These delays also hindered the execution of necessary service and repair contracts, according to former employees.

### JUNE 14, 2024

179.    On June 14, 2024, New Fortress issued a press release titled *NFE Announces First LNG in Days and First Cargo in July*. The press release stated, in relevant part, as follows:

> NEW YORK--(BUSINESS WIRE)--Jun. 14, 2024-- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") announces **First LNG in the coming days and First Cargo in July.**
>
> NFE today updated the timing of its First LNG expectation for its first Fast LNG unit located offshore Altamira, Mexico. The Company has made tremendous progress on its path towards the start of liquefaction operations.
>
> As of today, ***the work necessary to begin operations is complete and the Company has also completed the full remainder of pre-commissioning activities. The Company now expects to produce LNG in the next 10 days, and then expects to be able to deliver its First Cargo in July.***

(Emphasis added).

180.    The emphasized statements above were materially false and/or misleading when made because "the work necessary to begin operations" was not complete. Specifically, critical components of the FLNG unit, such as the heavy hydrocarbon removal unit, had not yet been commissioned, while other essential equipment, including the scrubs column bottom pump, remained malfunctioning and required repair. Also, the Company was not, at that time, prepared to produce LNG in the "coming days," as represented.

181.    According to former employees (see The Situation at the Altamira FLNG Project Grows from Bad to Worse, supra), executive management did not know when the FLNG unit would become operational. As a result, the Company was actively delaying the execution of service and repair contracts as of June 2024.

***JULY 23, 2024***

182.    On July 23, 2024, New Fortress issued a press release titled *New Fortress Energy Announces Closing of $700 Million Loan for Second FLNG Unit*. The press release stated, in relevant part:

> NEW YORK--(BUSINESS WIRE)--Jul. 23, 2024-- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") today announced that after successfully producing LNG at its first FLNG unit ("FLNG 1"), the Company has closed its previously announced $700 million loan for its second FLNG unit ("FLNG 2"). ***Now operational, FLNG 1 expects to deliver its first cargo in August and enter full production thereafter.***

(Emphasis added).

183.    The emphasized statement identified above was materially false and/or misleading. The Altamira FLNG Project was not "operational," contrary to the implication made in the press release. Furthermore, New Fortress did not, at that time, expect, nor did it have a reasonable basis to expect, that "first cargo" would be achieved in August 2024. Contrary to these statements, commercial production was still months away, given the actual status of the Altamira FLNG

Project at that time. Executive management did not know when the FLNG unit would become operational and, as a result, had been postponing the execution of service and repair contracts as recently as June 2024. Additionally, the "scrubs column bottom pump" failed commissioning in early July 2024, and the commissioning of the heavy hydrocarbon removal unit did not take place until late July 2024, according to former employees.

## THE TRUTH EMERGES

184.    On February 28, 2023, New Fortress reported its financial results for the fourth quarter of 2022 (4Q22) and, in relevant part, lowered its full-year guidance for 2023 while also pushing back the target mechanical completion date for the Altamira FLNG Project, as previously described. Following this partial disclosure, or the materialization of the previously concealed risk, the Company's common stock price fell from $38.74 per share on February 27, 2023, to $32.99 per share on February 28, 2023.

185.    Analysts reacted negatively to the announcement. BTIG, for example, lowered its price target for New Fortress from $50 to $48 per share and cited two primary concerns driving the sell-off: "while an earnings miss is never good, we believe the bigger drivers of the sell-off were 1) lower 2023 guidance, now at ~$2B, which was down 20% from $2.5B (we note consensus last night was $1.8B, BTIG $1.7B) and 2) lower expected production volumes from the FLNG #1 (though it's still expected to start in July, we are modeling a 4Q start), with FLNG #1 2023 production guidance at 29 TTBtu (down from 47 TTBtu last quarter)."

186.    On February 29, 2024, New Fortress reported its financial results for the fourth quarter of 2023 (4Q23) and provided guidance for 2024. The Company also disclosed additional delays at the Altamira FLNG Project. Analysts responded by highlighting the significance of these delays, confirming their material impact on the market. For example, J.P. Morgan published a

report titled *Strong 4Q23 Results & 2024 Guidance; Further Delays to First LNG at FLNG1*, noting that "NFE's 4Q23 adjusted EBITDA was modestly above expectations . . . . However, the Company slightly pushed back its first LNG target date to March 2024." Similarly, Morningstar also addressed the delays, stating that New Fortress had shifted its timeline for the Altamira facility to March 2024, after previously targeting 2023. Analysts emphasized the importance of the project's timing given New Fortress' pressing need to "boost volumes and generate the cash needed to meet its maturing debt and new obligations . . . ."

187.    Following this partial disclosure, and the materialization of the previously concealed risk, the Company's stock price again declined from $35.15 per share on February 29, 2024, to $34.43 per share on March 1, 2024, and continued to fall further to $32.02 per share by March 4, 2024.

188.    On July 23, 2024, New Fortress announced the closing of new financing that had been initially disclosed in February 2024. Notably, the announcement stated that the financing agreement followed the completion of the first liquefaction at the Altamira FLNG Project just days earlier, and that the Company now expected to deliver its "first cargo" in August 2024. This update represented yet another delay, as New Fortress had most recently projected the first cargo would be delivered in July 2024, following an original target set for 2023.

189.    Following this next partial disclosure, and another materialization of previously concealed risk, the Company's stock price once again dropped from $25.64 per share on July 22, 2024, to $21.85 per share on July 23, 2024, and continued to decline to $20.65 per share on July 24, 2024.

190.    Analysts and investors finally began to grasp the true state of the Altamira FLNG Project after New Fortress reported its financial results for the second quarter of 2024 (2Q24). On

August 9, 2024, the Company issued a press release announcing unexpectedly weak earnings and a downward revision to its guidance for the second half of the year. The press release stated, in relevant part, as follows:

> Our Adjusted EBITDA in the second quarter of $120 million was well below our expectation of $275 million. This was largely the result of delays in placing our FLNG 1 project into service, which was originally expected to occur at the beginning of the second quarter. As detailed in our earnings presentation, the cost of this delay is approximately $150 million per quarter in lost operating margin, which represents the vast majority of the Adjusted EBITDA shortfall for the quarter.

191.    The press release also included a statement from Edens, which read, in pertinent part:

> We have a large and expanding business, with a broad and robust portfolio and customers. While we are disappointed in the delay in placing FLNG 1 into service, it is now operational and we are very excited about the future of our business.

192.    Several prominent analysts issued reports in response to New Fortress' quarterly announcements, reflecting the market's reaction to the Company's revised guidance and operational setbacks.

193.    J.P. Morgan, for example, issued a report on August 9, 2024, titled *2Q24 Every Bit as Bad as Expected; Guidance Sets Up a "Credibility Rerack."* The report stated that "2Q24 was an abysmal quarter on EBITDA and free cash flow," attributing part of the poor performance to "the delay on FLNG1." However, the report also noted a shift in tone, stating that "management used the quarter as an opportunity to lay out what we view as appropriately conservative and transparent guidance ***(for perhaps the first time)***" (emphasis added). The report specifically addressed New Fortress' prior communications regarding the Altamira FLNG Project, stating: "[a]fter years of overly aggressive and opaque guidance and the ~7 month delay on FLNG1, the Company appropriately reracked guidance and added substantially more detail in the 2Q24 presentation."

98

194.    BTIG also released a report on August 9, 2024, titled *Guidance Lowered on FLNG Delays, with Terminals Driving Volume Growth in 2025*. The report stated, in pertinent part: "NFE is trading ~19% lower midmorning after reporting earnings (BMO) with adj. EBITDA of ~$120M coming ~34% below consensus of ~$181M (BTIG ~$155M), which management attributed to the previously announced later than expected startup of LNG production at FLNG #1. The unit is now in service and expected to reach full production later this quarter after some planned maintenance. FLNG related delays led management to cut 2024 adj. EBITDA guidance to $1.4–1.5B."

195.    Deutsche Bank also issued a report on August 9, 2024, stating: "New Fortress Energy (NFE) reported adj. 2Q24 EBITDA of just $120 million, which was well below the Street estimate of $177 million and our estimate of ~$176 million. The Company lowered its 2024 adj. EBITDA 'goal' from ~$2.0 billion to between $1.4–$1.5 billion, which includes the Company's expectation for a one-time cash settlement related to the ex-FEMA contracts of approximately $600 million. In other words, the Company's illustrative adj. EBITDA goal related to ongoing operations is just ~$900 million for FY24."

196.    Investors also responded swiftly to New Fortress' disclosures. The Company's common stock experienced a sharp decline, dropping from a closing price of $17.02 per share on August 8, 2024, to $13.00 per share on August 9, 2024. This significant drop occurred on unusually heavy trading volume, reflecting the market's negative reaction to the revelations.

197.    New Fortress continued to revise its earnings projections downward. As of November 7, 2024, the Company reduced its full-year EBITDA target to $855 million. At the same time, its long-term debt had ballooned to approximately $8 billion, roughly three times the size of New Fortress' market capitalization, highlighting a severe imbalance in its financial

position. To raise capital, the Company entered into a debt financing agreement at a steep 12% interest rate. This high interest level suggests that New Fortress is not well-capitalized and is instead facing significant financial pressure to deleverage its balance sheet, contradicting earlier claims by Edens during the Relevant Period that the Company was financially stable. Further compounding investor concerns, following the Company's third quarter earnings announcement on November 7, 2024, media reports revealed that Edens had retained Lazard Inc. and Intrepid Financial Partners LLC to explore potential asset sales. These potential divestitures may include LNG facilities, according to the reports. Absent successful asset sales or a major refinancing of its debt, New Fortress' management has concluded that "substantial doubt exists related to the Company's ability to continue as a going concern."

198.    The attention analysts and the broader market gave to the delays at the Altamira FLNG Project, and the corresponding impact on New Fortress' earnings, demonstrates that investors placed significant weight on the Defendants' false and materially misleading statements. The consistent focus on these issues, both in analyst reports and market reactions, underscores the importance of the information that was misrepresented. Defendants' repeated public commentary on these matters, coupled with the market's sharp response to subsequent corrective disclosures, confirms that the statements made throughout the Relevant Period were material to investors.

## SUMMARY OF THE INDIVIDUAL DEFENDANTS WRONGFUL CONDUCT

199.    The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

200.    The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

201.    The Individual Defendants breached their fiduciary duties to New Fortress because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated that: (1) the construction, commissioning, and operation of the Altamira FLNG Project was progressing as planned and as communicated to stakeholders, instead of being hindered by disorganized execution, inadequate planning, a failure to properly sequence construction and commissioning activities, and delays caused by the lack of timely procurement of essential components; (2) the construction, commissioning, and operation of the Altamira FLNG Project was progressing on schedule and as communicated to stakeholders, when the timelines issued by the Company in fact lacked any reasonable basis and were internally recognized as unrealistic; (3) the positive revenue and growth projections for the Company, highly dependent on the timely and successful construction, commissioning, and operation of the Altamira FLNG facility, were accurate and on target; (4) the Company's reports, financial filings and public statements regarding the status of the Altamira FLNG project were accurate and fairly presented; and (5) there was a reasonable basis for the positive statements regarding the Company's business, operations, and future prospects that supported the Company's stock price and market valuation.

## DAMAGES TO NEW FORTRESS

202.    As a direct and proximate result of the Individual Defendants' misconduct, New Fortress has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

203.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

204.    These expenditures also include, but are not limited to, the costs associated with implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

205.    These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

206.    As a direct and proximate result of the Individual Defendants' actions, New Fortress has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

207.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

208.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

209.    Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

210.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

211.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

212.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

213.    The Company's Board is currently comprised of eight members: seven Defendants – Edens, Nardone, Catterall, Grain, Griffin, Jay, and Wanner (the "Director Defendants") – and Charles Sledge, who was appointed to the Board in April of 2025. Thus, Plaintiff is only required to show that a majority of the current Directors, i.e., 4, cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

214.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

215.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**Defendant Edens**

216.    Defendant Edens is not disinterested or independent, and therefore, is incapable of considering demand because Edens is, and was at all relevant times, an employee (CEO since August 2018) and Chairman of the Board of Directors. His role as founder, his current roles with the Company, and his current 19.6% ownership of Company stock make him not disinterested or independent.

217.    In addition, Edens is a defendant in the Securities Class Action, which seeks to hold him liable for much of the same wrongdoing as is alleged herein.

218.    Furthermore, the Company's 2025 Proxy concedes that Edens is not an independent director.

219.    The lack of independence and financial investment by Edens renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

220.    As such, Defendant Edens cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendant Nardone**

221.    Defendant Nardone is not disinterested or independent, and therefore, is incapable of considering demand because he is the Company's co-founder and second largest shareholder holding 9.6%.

222.    Furthermore, the Company's 2025 Proxy concedes that Nardone is not an independent director.

223.    The lack of independence and financial investment by Nardone renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

224.    As such, Defendant Nardone cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, as that would expose him to substantial liability and threaten his livelihood.

**Defendants Grain, Griffin, and Wanner**

225.    Defendants Grain, and Griffin, and Wanner are not disinterested or independent, and therefore, are incapable of considering demand because they serve as members of the Board of Directors and as members of the Audit Committee (Defendant Wanner sits as Chair of the Committee). Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public.

226.    For these reasons, Grain, Griffin, and Wanner (Chair) breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore excused.

227.    The Directors, as members of the Board, were and are subject to the Code of Business Conduct, which goes well beyond the basic duties required by applicable laws, rules, and regulations.  Specifically, the Code require Directors to act with good judgment, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated this Code because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Code of Conduct, face substantial liability, and are not independent or disinterested, making demand upon them futile.

228.    Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

229.    New Fortress has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

New Fortress any part of the damages New Fortress suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

230.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

231.    The acts complained of herein constitute violations of fiduciary duties owed by New Fortress' officers and directors, and these acts are incapable of ratification.

232.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of New Fortress. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of New Fortress, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance

policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

233.    If there is no directors' and officers' liability insurance, then the Directors will not cause New Fortress to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

234.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## COUNT 1

### Breach of Fiduciary Duty
### Against the Individual Defendants

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of New Fortress' business and affairs.

237.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of New Fortress' shareholders.

238.    In breach of their fiduciary duties owed to New Fortress, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

239.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of New Fortress' securities.

240.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

241.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, New Fortress has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

242.    Plaintiff, on behalf of New Fortress, has no adequate remedy at law.

## COUNT II

### Violations of Section 14(a) of the Exchange Act
### Against the Director Defendants

243.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

244.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

245.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

246.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxy statements filed with the SEC on April 4, 2023 and April 29, 2024 (the "2023 Proxy" and the "2024 Proxy" respectively).  Specifically, the 2023 Proxy and 2024 Proxy contained false statements and failed to disclose that (i) the Altamira FLNG Project was hindered by disorganized execution, inadequate planning, a failure to properly sequence construction and commission activities, and delays cause by the lack of timely procurement of essential components; (ii) that the schedule issued by the Company regarding the Altamira FLNG Project lacked any reasonable basis and was internally recognized as unrealistic; (iii) that due to these issues, the Company's financial projections based on the success of the Altamira FLNG project were inaccurate; and (iv) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

247.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

248. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

249. Plaintiff has no adequate remedy at law.

## COUNT III

**Unjust Enrichment Against The Individual Defendants**

250. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of New Fortress.

252. Each of the Defendants received payment from New Fortress, in the form of either salary or director fees, or had an ownership interest in the Company, while actively breaching their fiduciary duties to New Fortress

253. All the payments and benefits provided to defendants were at the expense of New Fortress. The Company received no benefit from these payments.

254. Plaintiff, as a shareholder and a representative of New Fortress, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

255. Plaintiff, on behalf of New Fortress, has no adequate remedy at law.

## COUNT IV

**Waste of Corporate Assets**
**Against the Individual Defendants**

256.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused New Fortress to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

258.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

259.    Plaintiff, on behalf of New Fortress, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)    Declaring that the Plaintiff may maintain this action on behalf of New Fortress Energy Inc. and that Plaintiff is an adequate representative of the Company;

b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to New Fortress Energy Inc.;

c)    Determining and awarding to New Fortress Energy Inc. the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve New Fortress Energy Inc.'s corporate governance and internal procedures to comply with applicable laws and to protect New Fortress Energy Inc. and its shareholders from a repeat of the damaging events described herein;

e)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 13, 2025

**KUEHN LAW, PLLC**

*/s/Justin Kuehn*
Justin A. Kuehn
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*

## **VERIFICATION**

I, Robert Troha, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing.  To those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of New Fortress Energy, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this _12_ day of _2025_ 2025.

_Robert Troha_
Robert Troha (Jun 12, 2025 12:21 EDT)
Robert Troha